**JAMES R. GREINER, ESQ.**
CALIFORNIA STATE BAR NUMBER 123357
**LAW OFFICES OF JAMES R. GREINER**
555 UNIVERSITY AVENUE, SUITE 290
SACRAMENTO, CALIFORNIA 95825
TELEPHONE: (916) 649-2006
FAX: (916) 920-7951

ATTORNEY FOR DEFENDANT
CHRISTOPHER WARREN

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR. NO. S-09-00121-JAM |
|     PLAINTIFF, ) | FORMAL OBJECTIONS TO PRE-SENTENCE REPORT |
|     v. ) | |
| CHRISTOPHER WARREN, et al., ) | DATE: SEPTEMBER11, 2012 TIME: 9:45 A.M. |
| ) | COURTROOM: 6, 14TH FLOOR |
|     DEFENDANTS. ) | JUDGE: HONORABLE DISTRICT COURT JUDGE |
| ————————————————) | JOHN A. MENDEZ |

DEFENDANT CHRISTOPHER WARREN'S

OBJECTIONS TO ADVISORY GUIDELINE

PRE-SENTENCE INVESTIGATION REPORT

# TABLE OF CONTENTS

A- PREFACE ........... 6

I- Law of Advisory Sentencing Guidelines ........... 7

II - Objections preserved for the Record ........... 8

FACTUAL BASIS OBJECTIONS ........... 8

A- FACTUAL BASIS OBJECTION TO PARAGRAPH 6 ON PAGE 4 OF THE PSR ........... 8

B- FACTUAL BASIS OBJECTION TO PARAGRAPH 7 ON PAGE 4 OF THE PSR ........... 9

C - FACTUAL BASIS OBJECTION TO PARAGRAPH 10 ON PAGES 5-6 OF THE PSR ........... 10

D- FACTUAL BASIS OBJECTION TO PARAGRAPH 12 ON PAGES 6 OF THE PSR ........... 11

E - FACTUAL BASIS OBJECTION TO PARAGRAPH 16 ON PAGE 8 OF THE PSR ........... 22

F - FACTUAL BASIS OBJECTION TO PARAGRAPH 17 ON PAGE 9 OF THE PSR ........... 23

G - FACTUAL BASIS OBJECTION TO PARAGRAPH 18 ON PAGE 9 OF THE PSR ........... 24

H - FACTUAL BASIS OBJECTION TO PARAGRAPH 20 ON PAGES 9-10 OF THE PSR ........... 24

I - FACTUAL BASIS OBJECTION TO PARAGRAPH 21 ON PAGE 10 OF THE PSR ........... 25

II - OBJECTIONS TO OFFENSE LEVEL COMPUTATIONS OF THE ADVISORY GUIDELINES ........... 28

A- PROBATION FOR THE FIRST TIME IN THE FINAL PSR ARGUES FOR 10 OR MORE VICTIMS ........... 29

B - SUSAN AND RICHARD DAVIS ARE VICTIMS OF NARAS ........... 33

C-ACCEPTANCE OF RESPONSIBILITY ........... 34

I - THERE HAS NEVER BEEN A RECANTING OF WARREN'S ACCEPTANCE OF RESPONSIBILITY ........... 36

II - NINTH CIRCUIT CASE OF HUNT ........... 41

III - PRE-INDICTMENT ACTIVITY TO DETERMINE ACCEPTANCE OF RESPONSIBILITY WITH DEFENDANT OUT OF THE COUNTRY ........... 41

2

SECOND CIRCUIT ACCEPTANCE OF RESPONSIBILITY          45
AND FUGITIVE

FIFTH CIRCUIT ACCEPTANCE OF RESPONSIBILITY          46
AND FUGITIVE

SEVENTH CIRCUIT ACCEPTANCE OF RESPONSIBILITY         48
AND FUGITIVE

NINTH CIRCUIT ACCEPTANCE OF RESPONSIBILITY          49
AND FUGITIVE

DISTRICT OF COLUMBIA CIRCUIT                         50
ACCEPTANCE OF RESPONSIBILITY AND FUGITIVE

IV - AWARDING GILILLAND ACCEPTANCE                  51
JUSTIFIES AWARDING WARREN ACCEPTANCE

D - BREACH OF PLEA AGREEMENT BY THE GOVERNMENT      52
ALLOWS FOR SPECIFIC PERFORMANCE

I- BREACH OF THE PLEA AGREEMENT BY                  53
THE 10 OR MORE VICTIMS

II - BREACH OF THE PLEA AGREEMENT BY                58
MATERIALLY INFLUENCING THE COURT TO IMPOSE
A HARSHER SENTENCE

III - THE GOVERNMENT BREACHED THE PLEA AGREEMENT62
BY INFLUENCING PROBATION TO DENY
ACCEPTANCE OF RESPONSIBILITY

CONCLUSION                                          64

Exhibit A is the Change of Plea Transcript

Exhibit B is the one page document from Probation regarding number of alleged victims

Exhibit C is e mail from government stating during plea negotiations the government is leaving out the number of victims because the government has fewer that 10 total lender victims–dated December 22, 2012

# TABLE OF AUTHORITIES

Gall v. U.S., 552 U.S. 38, 46, 49-50, 128 S.Ct. 586, 169 L.Ed. 2d 445 (2007)          7

Johnson v. Mutual Ben. Life Ins. Co., 847 F.2d 600, 603 (9th Cir. 1988)          22

Kimbrough v. United States, 552 U.S. 85, 108 S.Ct. 558, 169 L.Ed.2d 481 (2007)          7

Rita v. United States, 551 U.S 338, 127 S.Ct. 2456, 168 L.Ed.2d. 203 (2007)          7

Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495,
30 L.Ed.2d 427 (1971)                    32, 53, 57, 61

U.S. v. Ayala, 47 F.3d 688, 691 (C.A. 5 (Tex.) 1995)          47

U.S. v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005)                    Pasim

U.S. v. Chapa-Garza, 62 F.3d 118, 120 and 123 (C.A. 5 (Tex.) 1995)          47

U.S. v. Chavez-Gutierrez, 961 F.2d 1476, 1480-1481 (9th Cir. 1992)          27

U.S. v. Collins, 61 F.3d 1379, 1386 (9th Cir. 1995)          49

U.S v Fudge, 325 F.3d 910, 916, 923 (C.A. 7 (Wis) 2003)          48

U.S. v. Mount, 675 F.3d 1052 (C.A. 7 (Ind.) 2012)          48

U.S. v. Reeves, 586 F.3d 20, 296, 297, 300  (C.A.D.C. 2009)          50

U.S. v. Tremelling, 43 F.3d 148, 152 (C.A. 5 (Tex.(1995)          48

U.S. v. Chavez-Gutierrez, 961 F.2d 1476, 1480-1481 (9th Cir. 1992)          47

U.S. v. Williamson, 291 Fed. Appx. 595 (C.A. 5 (Tex) 2008)          46

United States v. Allen, 434 F.3d 1166, 1175 (9th Cir. 2006)          42

United States v. Ainsworth, 932 F.2d 358, 363, n. 3 (5th Cir.)          47

United States v. Block, 660 F.2d 1086, 1090-1092 (5th Cir 1981)          42

United States v. Ceccarani, 98 F.3d 126 (3rd Cir. 1996)          44

United States v. Daniel, 667 F.2d 783 (9th Cir 1981)          15

United States v. Ellis, 641 F.3d 411, 415-417 (9th Cir. 2011)          7, 42, 54, 56, 60, 63

United States v. Fisher, 162 F.3d 93 (5th Cir 1998)          47

United States v. Franco-Lopez, 312 F.3d 984, 989, (9th Cir. 2002)          3, 54

United States v. Hunt, 656 F.3d 906, 911 (9th Cir. 2011)          41

United States v. Keen, 508 F.2d 986, 989 (9th Cir. 1974)          13

4

United States v. Loeb, 45 F.3d 719, 722 (C.A. 2nd N.Y., 1995)                    45

United States v. Mara, 523 F.3d 1036, 1038 (9th Cir. 2008)                    38

United States v. McLaughlin, 378 F.3d 35, 38 (1st Cir. 2004)        36, 37, 44

United States v. Ramos-Medina, 682 F.3d 852, 859 (9th Cir. 2012)        36

## A.
## PREFACE

The defendant, Christopher Warren, again, for at least the seventh (7th) time since he was arrested on February 10, 2009, expressly accepts complete and full responsibility for all of his actions, expresses his specific contrition for all of the harm he has caused to all of the institutional victims, expresses remorse and sorrow to all of the institutional victims who have suffered needless losses of money and been placed in financial difficulties and harm due to Christopher Warren's actions, and continues to express his continued willingness to be debriefed/interviewed by any and all government authorities on any and all subjects regarding Christopher Warren's actions including any and all assets.

The defendant, through counsel, has a legal obligation to file formal objections with the Court regarding the Pre-sentence investigation report, and by doing so, expressly states this legal filing takes nothing away and should not be construed in any way to detract from Christopher Warren's continued complete and total acceptance of responsibility, contrition and remorse for everything he has done to cause harm.

Even in the filing of these legal objections, defendant Warren expressly and specifically stands by the plea agreement he reached in the arms length negotiations with the government to recommend a total sentence of 175 months to this Court. Nothing in the filing of these objections is in anyway backing away from that agreement by the defendant. The objections, by legal necessity, are responding legally to the PSR report that contains inaccurate factual information which is being corrected by the defendant so that no argument can be made by the government or probation that either Mr. Warren agreed to the inaccurate information or Mr. Warren never corrected the inaccurate information; inaccurate application of the Advisory Sentencing Guidelines.

Finally, before the government ever steps into the sentencing Court, the government has breached the plea agreement. (See Exhibits A, B and C)

# I

## LAW OF ADVISORY SENTENCING GUIDELINES

As the United States Supreme Court state in Gall v. U.S., 552 U.S. 38, 46, 49-50, 128 S.Ct. 586, 169 L.Ed. 2d 445 (2007):

> "In Booker we invalidated both the statutory provision, 18 U.S.C. section 3553(b)(1) (2000 ed., Suppl. IV), which made the Sentencing Guidelines mandatory ....As a result of our decision, the Guidelines are now advisory....

> "As we explained in Rita (Rita v. United States, 551 U.S 338, 127 S.Ct. 2456, 168 L.Ed.2d. 203 (2007), a district court should begin all sentencing proceedings by correctly calculating the applicable Guideline ranges. (Citation omitted) As a mater of administration and to secure nationwide consistency, the Guidelines should be the starting point, and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district court should then consider all the section 3553(a) factors to determine whether they support the sentence suggested by a party (footnote omitted). In so doing, he may not presume that the Guidelines range is reasonable. (Citation omitted) He must make an individualized assessment based on the facts presented.

As the Ninth Circuit stated in United States v. Ellis, 641 F.3d 411, 415-417 (9th Cir. 2011):

> "The calculation of the Guidelines range is the critical first step in the sentencing process. Even though the Guidelines are advisory, they are still the "starting point and the initial 'benchmark' for the sentencing process. (Kimbrough v. United States, 552 U.S. 85, 108 S.Ct. 558, 169 L.Ed.2d 481 (2007) (quoting Gall v. United States, 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)) ....

> "The first step in calculating the applicable Guideline range is to ascertain a defendant's offense level, that is, the number of points associated with his criminal activity.

> "After determining the base offense level, the next step under the Guidelines is to apply 'any appropriate specific offense characteristics, cross references, and special instructions contained in the particular guideline in Chapter Two in the order listed.

> "Next, the Guidelines require the application of any applicable adjustments."

# II

## OBJECTIONS PRESERVED

7

**FOR THE RECORD**

The defendant, Christopher Warren, through counsel, makes the following factual basis objections as being inaccurate as to either their relevancy or being inaccurate as to the facts themselves.

The factual basis objections the defense has are as follows:

**FACTUAL BASIS OBJECTIONS**

**A**

**FACTUAL BASIS OBJECTION TO PARAGRAPH**

**6 ON PAGE 4 OF THE PSR**

The defense objects to paragraph 6 on page 4 in the PSR (which was objected to in the informal objections under the time line paragraphs of events) as not relevant to the defendant's conduct either in this case, in the plea agreement or in the broad definition of relevant conduct used by the Advisory Sentencing Guidelines:

A- **paragraph 6**, **on page 4**, the probation office has expressly stated, the plea agreement expressly states, that the defendant "had no involvement with preparing Naras fund statements or otherwise pitching the LWS wealth building program to individual investors (See PSR pages 5-6, paragraph 10);  "Warren had no involvement with preparing Naras fund statements or otherwise pitching the LWS wealth building program to individual investors"; (see plea agreement page 19, lines 13-16), "Warren had no involvement with preparing NARAS fund statements that were sent to investors or in otherwise pitching the Loomis Wealth solutions wealth-building program to individual investors.) Paragraph 6 is not relevant to Warren. Looking at the Advisory Sentencing Guideline 1B1.3(a)(1)(A), nothing in paragraph 6 fit into "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured or willfully caused by the defendant". To have both the plea agreement entered into by the government and Warren and the probation office agreeing "Warren had no

8

1    involvement with preparing Naras fund statements or otherwise pitching

2    the LWS wealth building program to individual investors", and then to

3    have paragraph 6 in the PSR, makes the plea agreement between the

4    parties worthless and the finding by probation meaningless. Neither is

5    correct. (U.S. v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005) and 1B1.3

6    App. Note 2) As the Court knows, under the Advisory Sentencing

7    Guidelines, mere knowledge by Warren of activities going on by others is

8    not enough to make others conduct relevant to Warren.

9                                              **B**

10                  **FACTUAL BASIS OBJECTION TO PARAGRAPH**

11                          **7 ON PAGE 4 OF THE PSR**

12           The defense objects to paragraph 7 on page 4 in the PSR (which was objected to

13   in the informal objections under the time line paragraphs of events)  as not relevant to

14   the defendant's conduct either in this case, in the plea agreement or in the broad

15   definition of relevant conduct used by the Advisory Sentencing Guidelines:

16                  B- **paragraph 7, on page 4**, dealing with the how Lee Loomis ran his

17                  Ponzi scheme not the actions of the defendant. The paragraph talks about

18                  what Lee Loomis did, not Warren, and again everyone agrees "Warren

19                  had no involvement with preparing Naras fund statements or otherwise

20                  pitching the LWS wealth building program to individual investors" (See

21                  PSR pages 5-6, paragraph 10; see plea agreement page 19, lines 13-16)

22                  (U.S. v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005) and 1B1.3 App.

23                  Note 2) As the Court knows, under the Advisory Sentencing Guidelines,

24                  mere knowledge by Warren of activities going on by others is not enough

25                  to make others conduct relevant to Warren.

26

27                                             **C**

28                  **FACTUAL BASIS OBJECTION TO PARAGRAPH**

                                              9

## 10 ON PAGES 5-6 OF THE PSR

The defense objects to paragraph 10 on pages 5-6 in the PSR (which was objected to in the informal objections  under the time line paragraphs of events)as not relevant to the defendant's conduct either in this case, in the plea agreement or in the broad definition of relevant conduct used by the Advisory Sentencing Guidelines:

C- **paragraph 10**, **on pages 5-6**, the portion that refers to "to 13 lenders" as this is not true nor proven by either the government or probation by a preponderance of the evidence[1], the defendant as a Department of Real Estate Broker at that time[2] was not approved to submit loan files to JP Morgan Chase, AMTRUST, First Horizon, Chase Home Financial, Independent Bank, Wells Fargo, SunTrust Mortgage[3]. There is no evidence to support or prove this statement. Warren was never approved to submit loan files to those institutions. None of those institutions have ever come forward and produced any documentation that Warren was approved to submit loan applications to JP Morgan Chase, AMTRUST, First Horizon, Chase Home Financial, Independent Bank, Wells Fargo, SunTrust Mortgage. The California Department of Real Estate has never

---

[1] The burden of proof at a sentencing hearing.

[2] Mr. Warren has voluntarily surrendered his California Real Estate Broker License.

[3] Neither the probation office or the government have any evidence that defendant Warren was ever approved to submit loan files to JP Morgan Chase, AMTRUST, FirstHorizon, Chase Home Financial, Indpendent Bank, Wells Fargo and SunTrust Mortgage. In fact, the only evidence presented to the defense *after* all of the informal objections were made to the PSR, which did **not** contain any 2 level increase for 10 or more victims, is one document with the wording "Loomis related loans September 2007 through April 2000 where C Warren *likely* involved". The government has not produced any discovery on this point to the defense and the probation office has simply provided a one page document that lists lender names, number of loans, number of locations and gross loan amounts and nothing more. The reason no discovery, there is no discovery stating that Warren was ever approved to submit loan files to JP Morgan Chase, AMTRUST, FirstHorizon, Chase Home Financial, Indpendent Bank, Wells Fargo and SunTrust Mortgage, and probation and no federal agent has any document proving that Warren was ever approved. The word "likely" without any reliable evidence is meaningless. Further, Warren has now presented evidence, and challenged the probation statement, that Warren was ever so approved. Neither the government nor probation can prove this point, even by the low burden of a preponderance of evidence.

1    produced any document from any of these institutions, JP Morgan Chase,

2    AMTRUST, First Horizon, Chase Home Financial, Independent Bank,

3    Wells Fargo, SunTrust Mortgage, complaining that Warren is not

4    approved to submit loan files to us and Warren continues to do it, would

5    you investigate this. As the Court knows, under the Advisory Sentencing

6    Guidelines, mere knowledge by Warren of activities going on by others is

7    not enough to make others conduct relevant to Warren.

8    The government, probation nor the federal agents have any documentary

9 evidence that Warren was approved to submit loan applications to  JP Morgan Chase,

10 AMTRUST, First Horizon, Chase Home Financial, Independent Bank, Wells Fargo,

11 SunTrust Mortgage. This is false, and this is also an objection by the defense to the

12 offense level and the breach of the plea agreement by the government.

13 <center>**D**</center>

14 <center>**FACTUAL BASIS OBJECTION TO PARAGRAPH**</center>

15 <center>**12 ON PAGES 6 OF THE PSR**</center>

16 The defense objects to paragraph 12 on page 6 in the PSR (which was objected to in

17 the informal objections) as being inaccurate in its facts. The defense provided a detailed

18 time line to probation, and will provide a more detail regarding the time line of the

19 events which took place so that the Court has an accurate and complete set of the fact

20 as it pertains to Warren. Where ever probation obtained its facts, probation was only

21 given selected portions of what occurred. Hopefully this will give a more complete

22 picture to the Court.

23    D- **paragraph 12, on page 6**, first, the paragraph is vague as to the time

24    frame of the events probation has listed, vague as to which interview

25    probation refers to as Warren had numerous interviews with the

26    government, the FBI, the IRS, both in person and by telephone, so

27    probation's paragraph leaves the reader guessing as to the time frame and

28    which of the many interviews probation (and the government, since the

<center>11</center>

information came from the government) is referring to. If probation is
referring to the September 2, 2008 meeting, as stated in my informal
objections that contained the time line of events, Triduanium did not fund
any illegal loans until November, 2008, thus, the September 2, 2008,
meeting could not be the referenced meeting of probation's words
"Warren admitted Triduanum was engaged in mortgage fraud by utilizing
an undisclosed cash back to buyers and sellers of the scheme."
As the defense provided to the government and probation in the informal
objections dated July 3, 2012, the time line sets forth when meetings
occurred and what Mr. Warren did in connection with the government and
government agents. So that the Court has any gaps filled in, here is a more
detailed accounting to correct probation's paragraph 12:

> 1- Triduanum ---- this business was incorporated in June 2008,
> however, the company only received a verbal commitment in
> August from Gateway Bank for a warehouse line of credit and was
> in negotiations with Taylor Bean Whitaker (TBW) and started
> funding loans about November, 2008
>
> 2- September 2, 2008--a meeting was held pursuant to a proffer
> agreement entered into between Chris Warren and his attorney at
> the time, Mr. Donald Heller and the Assistant U.S. Attorneys R.
> Steven Lapham and Russell Carlberg and other agents of the United
> States, and included Tricia Sommers, Senior Deputy Commissioner,
> California Department of Real Estate interviewing Warren. The
> interview lasted approximately 4 hours and 20 minutes.
>
>> a- It is in this meeting where the parties to the meeting have a
>> discussion about Warren not doing any more illegal activities
>> and Warren responding he "could hit the brakes", with the
>> government replying if it was about money, Warren could be

12

provided a few thousand dollars out of a fund that is
available. The government and Warren agreed that Warren
would "delay transactions while recording co-conspirators"[4].
However, as noted below, the FBI knew that Warren was
running and continued to run Creative Wealth Real Estate.

**b-** After September 2, 2008--- meeting with FBI agents and
others, then defendant Warren meets with FBI agents in the
back of a car and signs a co-operation agreement to work
with the FBI and begins making recorded telephone calls.
Then the FBI allowed Warren to began wearing wire taps at
meetings and making recorded telephone calls outside the
presence of the FBI with various individuals (this is verified
in the United States v. Garret Gililand, et al (On November 8,
2008, Warren recorded Leonard Williams which was used
by the government and FBI to get both the Indictment and
convictions and that is stated to have broken California law[5]),
CR-S-08-376–EJG, docket # 205[6], motion to exclude taped
telephone recordings and Christopher Warren is identified as
the person making the recordings. In the government's
opposition, docket # 224, they confirmed Warren did make

---

[4]Probation makes no mention of this part of the conversation in the September 2, 2008, meeting with the government. The government and federal agents know that Warren did not shut down all of his businesses, in fact, the government and federal agents had to have Warren's businesses up and running in order to have Warren make the recordings that not only the government and federal agents wanted but also that the government used in bringing several Indictments, as described herein. In fact, and omitted from the probation report was when the FBI technician's installed bugging devices throughout the offices of Creative Wealth Real Estate, a business as everyone knows, was run by Warren, and was running when the September 2, 2008, meeting took place and continued to run throughout 2008.

[5]See United States v. Keen, 508 F.2d 986, 989 (9th Cir. 1974)

[6]Probation leaves this information completely out of the PSR.

13

the recordings). This recording was made on November 8, 2008. (The government disclosed Mr. Warren's activities in the production of discovery in CR-S-08-376-EJG).

c- It was in this time frame after the September 2, 2008 meeting (it is after the FBI met Warren, had him begin to make recorded telephone calls in the presence of the FBI, that then the FBI allowed Warren to make calls outside the presence of the FBI) and before November 10, 2008, on a Sunday, and with the assistance of FBI technicians, that the FBI  installed bugging devices throughout the Warren's Creative Wealth Real Estate offices (which both the government and federal agents knew had been and was continuing to do business, although the "hit the brakes" and "delay transactions while recording co-conspirators" was going on, as both the government and FBI knew).  This was to further the government's stated agenda of recording co-conspirators, while Warren delayed transactions. The government never complained, the federal agents wanted the recordings, the businesses continued operation delaying transactions while recording co-conspirators[7].

d- At no time while the FBI technicians were installing the bugging devices  did the either the government or the  FBI or the government tell Warren to close down Creative Wealth Real Estate. The reality is, the government and FBI had to have Creative Wealth Real Estate continue doing business, being run on a delayed basis as Warren agreed, to obtain the

---

[7]Probation leaves this information totally out of the PSR.

recordings of co-conspirators. In addition, in this time frame, September 2, 2008 to November 10, 2008, other recording devices were issued to Warren by the FBI for use in making additional audio recordings. All of the recordings made by Warren were turned over to the FBI in personal face to face meetings, except for one that was sent by e mail attachment. (The FBI did not want Warren sending the FBI e mails with information.[8]) The FBI knew of all the legal and/or illegal activities that were ongoing by the recordings made by Warren.

**e-** Finally, it is in the September 2, 2008, meeting, that in a discussion about not doing any fraudulent activities, that Warren said in the meeting, "I could hit the brakes" and the government responded, that if it is about money, that the government can give Warren a few thousand dollars out of a fund the government has. Later, after the November 10, 2008 termination letter signed by ASUA Matt Stegman not ASUA Russell Carlberg, and Warren's then attorney Mr. Heller,

---

[8]Although the FBI did not want Warren e mailing information, the FBI obtained an e mail of a recording that probation states in its responses to the informal objections, "second, after recording equipment was confiscated and being told he could not record anybody, he took it upon himself to break California law and record a subject on his equipment and then e mailed the recording to one of the agents". That states what happen in part, here is what probation left out. That recording that both the government states in its November 10, 2008 letter "that you nevertheless took it upon yourself to break California law and record a subject on the equipment" (the government's letter actually is confusing because it reads "Second, after your government recording equipment was confiscated and you were advised not to record anybody, you nevertheless took it upon yourself to break California law and record a subject on the equipment", which if the government recording equipment was confiscated, how did Warren use the previously confiscated government equipment to record a subject? A question for another time.) and probation states in its responses to the defenses informal objections "broke California law" was used by both the FBI and the government to file an Indictment in: United States v. Garret Gililland, et al, CR-S-08-376-EJG. Even if the recording violated California law, and there was never a judicial determination that it did, the recoding was legally obtained by the federal government and used to obtain the Gililland Indictment. Under federal law, as long as the audio recording is legal under federal law, it is admissible evidence, even if the audio recording was obtained in violation of California law. (United States v. Daniel, 667 F.2d 783 (9th Cir 1981)

15

had discussions with the government about the what the language of the statements "hit the brakes" and "delay transactions while recording co-conspirators" meant and the terminating of the co-operation agreement with the FBI, government and Warren. Mr, Heller was attempting to get back on board with the co-operation for Warren since the defense contending there was at a minimum ambiguity at the September 10, 2008 meeting regrading "hit the brakes" and "delay transactions while recording co-conspirators", demonstrated by the government's and the FBI's bugging of the Creative Wealth Real Estate offices;

    1- this September 2, 2008, in this meeting Warren provided the government, the federal agents  and state agents with substantial information regarding Loomis Financial Services and all people associated with that operation: Lee Loomis, John Hagener, Loomis Wealth Solutions, Joe Gekko, Jay Grivette, Mike Llamas, Sunvest, the Birdman brothers in Florida, Eric Estrada, CJ Armor, and Remy Heng.

3- After September 10, 2008— Defendant Warren completes the following for the government:

    a- Warren meets in a car with the FBI agents and signed the co-operation agreement and began making recordings;

    b- approximately 30 hours of audio wiretaps;

    c- approximately 3 hours of video recordings;

    d- Defendant Warren's substantial assistance to local authorities in Butte County led to the arrest and conviction in case # CM030138, People v. Boc Heng, a 99 plant marijuana

grow site at 2601 Sedina Avenue, Chico, California[9];

**e-** Audio recordings and telephone numbers led to the capture, arrest and extradition and conviction of two international fugitives as well as other defendants, including Leonard Williams (the infamous tape recording the federal government used), Garret Gililland and Nicole Magpusao: United States v. Gililland, CR-S-08-376–EJG;

1- Warren facilitated the location of Gililand and Magpusao, which eventually led to their extradition. The government allowed Warren to send over seas a "Pringles" can with $20,000 cash to the address in Spain that Gililland had given to Warren while Warren was recoding a international overseas telephone call with Gililland. Once the "Pringles" can arrived, Gililland had to go sign for it under the rouse that food had to be signed for in Spain when shipped internationally. Once Gililland signed for the "Pringles" can, the government knew where he was located and then the extradition journey began[10].

**f-** about this time the FBI and FBI technicians  meet with Warren at the offices of Creative Wealth Real Estate and place bugging recording devices in the office along with providing other recording devices[11];

**g-** Flight to Los Angeles with two (2) FBI agents and

---

[9]Probation leaves this information totally out of the PSR.

[10]Probation leaves this information totally out of the PSR.

[11]Again, this information probation totally left out of the PSR.

17

obtained recordings that led to the arrest and guilty plea in case, Carlos Chamorro: United States v. Chamorro, CR-S-10-405-EJG[12];

**h-** the video recording that led to the case CR-S-10-405, and in that recording it is heard that Cavell asks Warren "where's the wire". There is no verbal response, but the video shows Warren pointing to the watch he is wearing. Three to five days after the video was hand delivered to the FBI, Warren received a text message to meet at the FBI office in east Sacramento. Warren did, wherein the FBI played the video portion of Warren pointing to the watch. The FBI agent threatened to discontinue the co-operation agreement with Warren, but the FBI and Warren worked out their differences and Warren continued working for the FBI. Even here, the FBI knew about the ongoing businesses Warren was running because they had the bugging devices in Creative Wealth Real Estate Offices, and the FBI never says anything, never sends FBI technicians to take out the bugging devices[13].

**i-** within a day or two of that FBI Warren meeting regarding playing the video, that the FBI interviewed Scott Cavell at his house. The next day Cavell hired a lawyer and said no more and eventually became a fugitive who is still on the run, hold up in Ireland, which has no extradition treaty with the United States.

4- Before November 8, 2008 the FBI came to Warren's residence

---

[12]Probation leaves this information totally out of the PSR.

[13]Probation leaves this information out of the PSR.

and collected some of the recording devices. At that time the FBI said to Warren "we'll see what happens" because Mr. Warren did not answer his cell phone the previous day. Other than this incident, the defense knows of no other incident where Warren "lying about his availability" as probation writes;

5- November 2008-- This is when Triduanum began making legal loans and then as the company progressed the company committed fraud;

6- December 24, 2008--- Federal Grand Jury Subpoenas issued for: Triduanum Financial, Inc., Creative Wealth Real Estate, Superior Escrow Closings; these are complied with turning over approximately 9 banker boxes;

    **a-** In the probation office's response to the informal objections, on page 3, the first full paragraph on that page starting with " What you do not mention...", the probation office states "he (Warren) failed to provide other information as required by the subpoena such as passwords for computerized accounts. In actuality, when the subpoena's were complied with on December 24, 2008, neither the government, the FBI nor the IRS ever asked for any passwords of any kind.

    **b-** the only time the government, or the FBI or the IRS ever asked for passwords was in February, 2009, after Warren's arrest, when a flash drive was seized in the back pack that Warren had in his possession. The government asked for the password, Warren doesn't have the password since it belongs to Andre Wilson, but Warren does inform the government what is on the flash drive (a series of fraudulent income

19

documents, W-2 templates, Tax Templates, used by Andre
Wilson). The government sent the flash drive to Virginia to
be opened, and when opened the government confirmed with
Warren's then attorney, Mr. Heller, that Warren had told the
truth about the contents of the flash drive.

c- in addition, in the April 6, 2009, proffer provided to the
government by Warren, there were a series of online
passwords provided to the government

7- December/January 2008/2009---- at no time was Triduanum
verbally instructed to shut down its business; there was never a
cease or desist order ever issued regarding Triduanum and from
November to the beginning of December 2008, Triduanum had been
funding legal loans

8- December/January 2008/2009---- Defendant Warren answers
questions from AUSA Calrberg and IRS special agent Fitxpatirck
on a clobal understanding of mortgage fraud through the companies
Warren had worked for and with, as advised by his then attorney,
Mr. Heller, but never enters into a co-operation agreement with the
government. There were at least 2 conference calls, one had as part
of its subject Michael Yamas;

9- January 2009, a meeting with Carlberg and IRS agent, where the
9 banker boxes of documents were present. The agent would take a
document out of the banker box and ask Warren "how does this
show fraud", which Warren would then explain. The meeting was
several hours in length. The IRS agent said that this meeting was a
"treasure trove of information".

10- January 2009----Tiduanum is moved to Las Vegas and Warren
and Cavell commit fraud, steal the money and leave the country

11- February 5, 2009---Federal Criminal Complaint is filed

12- February 10, 2009--- Defendant Warren arrested;

13- Within 20 days of February 10, 2009---- Defendant Warren sends apology letter to AUSA Carlberg (probation has never attached this letter to either the responses to the informal objections or to the Court).

14- March 12, 2009-- Federal Indictment filed

15- April 6, 2009-- Counsel for Defendant Warren forwards to the government, through AUSA Carlberg, a letter and a typed version of 13 pages of handwritten notes from Defendant Warren, detailing the case activities and the money trail. Defendant Warren offers to the government to answer any and all questions the government may have on the entire case including the money trail. Warren provided passwords as detailed above. (As of May 29, 2012, the government had not accepted this offer to interview the defendant).

 **a-** April 6, 2009----In this letter Defendant Warren, long before any plea negotiations and probation interview (almost 3 years), outlines the entire events, gives a complete and total accounting for all of the money, both of Scott Cavell (a fugitive in Ireland) and the defendant's. Further, in this letter Defendant Warren satisfies all aspects of acceptance of responsibility, from detailing all of the illegal activities to a complete and full accounting for all of the proceeds. The government has had possession of this document for over three (3) years. This document is attached hereto for your review.

16- June 13, 2010--- Defendant Warren, through counsel, submitted a letter to the government attempting to settle globally all of the

potential cases. In this letter, Defendant Warren, indicated his willingness to debrief on everything to date. Thus, for the second time, the defendant offers to be interviewed and as of the May 29, 2012, the government had not accepted this offer.

17- December 15, 2011--- Defendant Warren, through counsel, again for the third time expresses not only information regarding the money trail, he again references the April 6, 2009 letter. Defendant Warren again makes himself available to the government to answer any questions about the case and/or money trail. As of May 29, 2012, the government had not accepted this offer.

18- the first informal objections sent on May 29, 2012, contained Warren's the fourth offer to be interviewed about all aspects of the case, including the money trail. The government accepted this fourth offer on June 25, 2012, wherein Warren provided the government and probation with a 5 page document regarding the money. (Attached hereto as Exhibit A)

**E**

**FACTUAL BASIS OBJECTION TO PARAGRAPH**
**16 ON PAGE 8 OF THE PSR**

The PSR states that "Warren and the principles of Triduanum promised to use best efforts and to act in good faith in their business dealings with TBW.

The PSR leaves out the Ninth Circuit law that "The implied covenant of good faith and fair dealing requires that neither party to a contract 'will injure the right of the other to receive the benefits of agreement'" (Johnson v. Mutual Ben. Life Ins. Co., 847 F.2d 600, 603 (9th Cir. 1988) As both the government and probation know, TBW was a fraudulent company from the beginning. To quote the government from their sentencing memorandum in the United States v. Lee Farkas, CR-S- 10-00200-LMB, in the Eastern District of Virginia:

1
2
3
4
5
6
7

"From 2002 to August 2009, Farkas orchestrated a fraud of staggering proportions- one of the largest bank fraud scheme's in this country's history- through his company, Taylor, Bean & Whitiker Mortgage Corp. ("TBW"). Farkas spearheaded the sale of more than 1.5 billion in fake mortgage assets to Colonial Bank, ultimately leaving a debt of more than $500 million in its Assignment of Trade ("AOT") financing facility. He misappropriated more than 1.5 billion from Ocala Funding, a commercial paper vehicle set up by TBW to finance mortgage purchases and funded by Deutsche Bank ("DB") and BNP Paribas ("BPN"). He oversaw the triple selling of mortgage loans , worth approximately $900 million to Colonial Bank, Ocala Funding, and Freedie Mae. He led an effort to fraudulently obtain another $553 million from the government's Troubled Asset Relief Program ("TARP")."

8   Paragraph 16, to be complete, should also have stated the facts about TBW, but

9   it did not. The defense requests this above paragraph be added to Paragraph 16 in the

10  PSR on page 8, in order for the complete factual basis about TBW is known.

11  **F**

12  **FACTUAL BASIS OBJECTION TO PARAGRAPH**

13  **17 ON PAGE 9 OF THE PSR**

14  The PSR at paragraph 17, page 8, reads in pertinent part:

15  "Warren and Cavell set up at least one safe deposit box where some gold
    coins were hidden".

16

17  First, Warren set up one safe deposit box in Arizona. Second, the government

18  seized the contents of that safe deposit box. Third, the government, probation and the

    federal agents have no evidence they can present to this Court that Warren set up more

19  than one safe deposit box (as Warren detailed on June 25, 2012, gold taken to Lebanon

20  was either placed into the safe at Mr. George Bittars father's jewerly store in

21  downtown Beirut or into the safe in the newly rented condo at Portemlio where Warren

22  was staying). There was only the one safe deposit box, and yet the PSR leaves the

23  reader guessing, are there other safe deposit boxes? There are not.

24  The defense requests that the sentence reads as to Warren "Warren set up one

25  safe deposit box in Arizona, which the government seized the contents of".

26  **G**

27  **FACTUAL BASIS OBJECTION TO PARAGRAPH**

28

### 18 ON PAGE 9 OF THE PSR

The PSR reads; "The government recovered approximately $500,000 worth of gold coins." And what the PSR leaves out and the reader guessing, where did the government recover the gold coins from. That was from the Arizona safe deposit box.

The defense requests the following be added: "These gold coins were recovered from Warren's one safe deposit box located in Arizona".

### H

### FACTUAL BASIS OBJECTION TO PARAGRAPH
### 20 ON PAGES 9-10 OF THE PSR

The PSR reads: "The case agent has identified the following 13 lenders as victims of the defendant's fraudulent conduct at LWS: CountryWide/Bank of America, JP Morgan Chase, Aurora (Lehman), AMTRUST Bank, First Horizon, IndyMac, Flagstar, Citimortgage, Chase Home Financial, GMAC, Independent Bank, Wells Fargo Bank, and SunTrust Mortgage". First, the PSR reads substantially different than the one page document provided to the defense on August 3, 2012 (See Exhibit B, attached hereto).

This is a false and misleading statement of fact that the government created when it knew as of December 22, 2011, there was no evidence to support 10 or more victims. (See Exhibit C) The government has breached the plea agreement, The government has remained silent since August 1, 2012, when the final PSR was produced, that this was a false and misleading statement. This false and misleading statement was known to be false to government supervisors, AUSA's who were on the critical and delicate December 22, 2011, e mail during sensitive plea negotiations with the defense.

The defense requests that the number 13 be reduced to no more than 8 institutions. The defense requests this entire paragraph be deleted from the PSR as false and misleading. In addition, the defense is objecting to the final PSR putting forth an increase of more than 10 victims in paragraph 35, page 13, which probation suggests adds a plus 2 to the offense level.

# I

## FACTUAL BASIS OBJECTION TO PARAGRAPH
## 21 ON PAGE 10 OF THE PSR

The defendant is in a bind, either agreeing with the government and the PSR that the defendant had no involvement in the Naras fund of the Loomis Wealth Solutions, or staying silent on agreeing, and not bringing this to the Court's attention.

However, by bringing this to the Court's attention, probation will be waiting to jump at the opportunity to claim the defendant is not accepting responsibility, is acting contrary to being remorseful and demonstrating contrition to the Court. The Court has already seen that probation has latched onto defense counsel's ethical duty and responsibility to represented fully and vigorously defendant by claiming in the PSR that:

> "However, in his informal objections, he now appears to be recanting as he states that since TB&W was a fraudulent entity, and that all funds exchanged between him (defendant) and TB&W were proceeds of that fraud, he (defendant) could not have "stolen" the funds and should not be held responsible payment (sic) of restitution. His position violates many aspects of the plea agreement and demonstrates he (defendant) has not accepted responsibility for his actions.

> "Also, in his formal objections, the defendant objected to the recommendation that no reduction for acceptance of responsibility be granted based on his failure to disclose the whereabouts of the money and gold, and the fact that he fled the country while under investigation. This pre-indictment conduct is important in analyzing the defendant's level of acceptance, especially now in light of his position that he can not be guilty of stealing from a fraudulent entity, because it demonstrates he (defendant) has never truly accepted responsibility for his actions and is unrepentant about his conduct. Therefore, no reduction is recommended."

First, probation either chooses to misread or ignores defense counsel's statement at the beginning of paragraph 16 of the modified informal objections of July 3, 2012, which reads:

> "16- In addition, I provide probation with information regarding Taylor Bean Whitaker (TBW), which ceased its operations on August 5, 2009. On August 14, 2009, TBW ceased all business operations and terminated all employees at its headquarters in Ocala, Florida.

The "I" provide, and the rest of the information is from defense counsel and not

1 from the defendant Warren. There is no other interpretation to that beginning or what

2 defense counsel was doing. Further, probation had before it, in the previous paragraph,

3 paragraph 15, the very same wording and language, but either choose to ignore that it

4 came from defense counsel and not the defendant or decided to take two different

5 interpretations with the very same language, in any event the use of the "I" was clear

6 that the information is coming from counsel:

15- On Thursday, May 31, 2012, I learned for the first time the following
facts which the defense contends bears on its argument in support of the 3
(three) point reduction for acceptance of responsibility:

In United States v. Gililland, et al, CR-S- 08-376--EJG, Nicole Magpusao
received at least the two (2) points off on her PSR for acceptance of
responsibility (it may have been the entire three (3) points off but I can not
make that representation). I have not read or seen Ms. Magpusao's PSR,
however, I understand, again I am writing for clarification, Hugo Ortiz did
the PSR and granted the acceptance of responsibility.

I further understand that Nicole Magpusao was a fugitive, traveling
internationally to two (2) countries, Columbia and Spain for over 11
months. My understanding is that a search warrant was served on the
home she resided at with her husband, Garrett Gililland in Chico in June
of 2008, and after then fled internationally prior to an Indictment being
filed by the government.

Further, Nicole Magpusao, who was not in custody in Spain, did fight
extradition for approximately 11 month and that the United States
expended time, effort and money in getting Nicole back to the United
States.

Thus, the reason I am writing. If these facts are true, then the granting of
acceptance of responsibility for a fugitive on the run internationally that
fought extradition for approximately 11 months and the denial of granting
acceptance of responsibility for Mr. Warren being out of the country for
approximately 8 days, February 3, 2009 (the date he left there was no
arrest warrant or criminal complaint or Indictment filed,

this did not happen until February 5, 2009) to his arrest early on February
11, 2009. Mr. Warren did not fight extradition from anywhere, appears to
be a contradiction and selective application in the Eastern District.

Thus, if the facts are true, then there could be an argument of unequal
treatment of granting acceptance of responsibility to individuals in the
Eastern District.

27 Thus, it is clear that in both paragraphs 15 and 16 and the following paragraphs

28 are from defense counsel, stating legal positions, not making statements of acceptance

of responsibility, since counsel can't do that, nor disclaiming acceptance of responsibility, counsel can't do that. However, since the government and probation could no longer stay with the original reasons for denying acceptance of responsibility of the defendant, the reasons had to change.

The change in the final PSR report was to grab onto defense counsel's statement of law, as defendant's own personal renunciation of his four years of total and complete acceptance of responsibility. This is unsupported by any case law opinion and should be rejected by the Court.

Further, no where does the PSR state that any of the defense counsel's informal objections are "falsely denying" or "frivolously contesting" any of the PSR statements. Defense counsel made no statement that was not supported by citation to case law, and no statement was made by defense counsel  such that any act is contrary to the defendant's four (4) year long laundry list of actions affirmatively demonstrating acceptance of responsibility and the non-association with criminal elements and criminal conduct. (U.S. v. Chavez-Gutierrez, 961 F.2d 1476, 1480-1481 (9th Cir. 1992)

Thus, knowing the past history of defense counsel making statements,  defense counsel  makes this legal argument.

Any loss to individuals is tragic and Warren is remorseful and his acceptance for all of his actions from the moment of his arrest demonstrates that contrition and remorse.

Loomis Wealth Building Solutions was a fraudulent company run by Lee Loomis, John Hagener, Loomis Wealth Solutions, and people associated with them: Joe Gekko, Jay Grivette, Mike Llamas, Sunvest, the Birdman brothers in Florida, Eric Estrada, CJ Armor, and Remy Heng. The Naras fund, which is where Susan and Richard Davis lost their money, was _**not**_ what  Warren was involved in, according to the PSR, (PSR page 5-6, paragraph 10)

When, or if, the federal government Indicts Lee Loomis and John Hagener, and the Naras investment, that is the legal assignment for Susan and Richard Davis to be victims and obtain there ability at restitution.

As bad as Warren's acts were, Warren was not involved with Naras which is where Susan and Richard Davis lost their money. The defense requests this paragraph be deleted.

## II
## OBJECTIONS TO OFFENSE LEVEL
## COMPUTATIONS OF THE ADVISORY GUIDELINES

The defendant, Christopher Warren, again, for at least the seventh (7th) time since he was arrested on February 10, 2009, expressly accepts complete and full responsibility for all of his actions, expresses his specific contrition for all of the harm he has caused to all of the institutional victims, expresses remorse and sorrow to all of the institutional victims who have suffered needless losses of money and been placed in financial difficulties and harm due to Christopher Warren's actions, and continues to express his continued willingness to be debriefed/interviewed by any and all government authorities on any and all subjects regarding Christopher Warren's actions including any and all assets.

The defendant, through counsel, has a legal obligation to file formal objections with the Court regarding the Pre-sentence investigation report, and by doing so, expressly states this legal filing takes nothing away and should not be construed in any way to detract from Christopher Warren's continued complete and total acceptance of responsibility, contrition and remorse for everything he has done to cause harm.

Even in the filing of these legal objections, defendant Warren expressly and specifically stands by the plea agreement he reached in the arms length negotiations with the government to recommend a total sentence of 175 months to this Court. Nothing in the filing of these objections is in anyway backing away from that

agreement by the defendant. The objections, by legal necessity, are responding legally
to the PSR report that the defense contents are inaccurate and need to be corrected.

### A
### PROBATION FOR THE FIRST TIME IN THE FINAL PSR
### ARGUES FOR 10 OR MORE VICTIMS

Only after the informal objections were made on May 29, 2012, only after the
government finally accepted the defendant's four (4) prior offers to be interviewed
about the case and the money, only after the final modified informal objections were
filed on July 3, 2012, probation in the PSR received by the defense on August 3, 2012,
puts in a two (2) level increase for 10 or more victims on the one page supporting
document attached, Exhibit B. The defense was blind sided by this event, had no prior
knowledge or notification that this was even contemplated by either the government or
probation.

The defense was not given any opportunity to informally object to this two (2)
level increase.

The defense has addressed this two (2) level increase in the objections to the
factual basis above and will so below, Bottom line, is that there are not more than 10
victims, even if the Court should add in Susan and Richard Davis, that would be
number 8.

The institutional victims are: TBW (Taylor Bean Whitiker, even though the PSR
spends 8 lines renouncing defense counsel for bringing up basic contract law principles,
and suggesting that this raising of the TBW fraudulent activity from 2002 to August
2009, having any contracts that TBW entered into void as based on fraud from the
beginning, was somehow an admission by the defendant that what Warren did was not
wrong) and JP Morgan Chase, AMTRUST, First Horizon, Chase Home Financial,
Independent Bank, Wells Fargo, SunTrust Mortgage. That is 8 and even if the Court
adds Susan and Richard Davis, that is only a maximum of 9 victims in this case and the
USSG 2B1.1(b)(2)(A) does not apply.

The PSR analysis could not be further from the documented events in this case, from the law, and from the duty defense counsel has in representing his client at all stages, including the critical stage of sentencing.

Warren stands in front of this Court accepting full and complete responsibility for all of his actions, and expresses again his remorse and contrition for all of his wrongful acts. Warren places before this Court no excuse, no justification and no third party is to blame for the only one to blame and the only one to accept that full and total blame is Warren, and he again does so.

Defense counsel stating Ninth Circuit contract law, does not diminish in the least or take away one bit, Warren's acceptance of responsibility. For probation to now base, in written form and in part, its denial of acceptance of responsibility on defense counsel's legal representation of his client, is unsupported by any case, Supreme Court, Ninth Circuit or any other Circuit Court opinion.

This Court on that basis should reject probations denial of acceptance of responsibility.

The PSR leaves out the Ninth Circuit law that "The implied covenant of good faith and fair dealing requires that neither party to a contract 'will injure the right of the other to receive the benefits of agreement'" (Johnson v. Mutual Ben. Life Ins. Co., 847 F.2d 600, 603 (9th Cir. 1988) As both the government and probation know, TBW was a fraudulent company from the beginning. To quote the government from their sentencing memorandum in the United States v. Lee Farkas, CR-S- 10-00200-LMB, in the Eastern District of Virginia:

> "From 2002 to August 2009, Farkas orchestrated a fraud of staggering proportions- one of the largest bank fraud scheme's in this country's history- through his company, Taylor, Bean & Whitiker Mortgage Corp. ("TBW"). Farkas spearheaded the sale of more than 1.5 billion in fake mortgage assets to Colonial Bank, ultimately leaving a debt of more than $500 million in its Assignment of Trade ("AOT") financing facility. He misappropriated more than 1.5 billion from Ocala Funding, a commercial paper vehicle set up by TBW to finance mortgage purchases and funded

by Deutsche Bank ("DB") and BNP Paribas ("BPN"). He oversaw the triple selling of mortgage loans , worth approximately $900 million to Colonial Bank, Ocala Funding, and Freedie Mae. He led an effort to fraudulently obtain another $553 million from the government's Troubled Asset Relief Program ("TARP")."

Exhibit B is the only document ever produced in this case about more than 10 victims in the case. The language on Exhibit B is only "where C Warren *"likely"* involved". The defense has presented evidence to the Court that Warren was not involved with and not approved to submit loan applications to JP Morgan Chase, AMTRUST, First Horizon, Chase Home Financial, Independent Bank, Wells Fargo, SunTrust Mortgage. There is no evidence to support or prove the statement by the case agent that "C Warren was "likely" involved" with 13 lenders. JP Morgan Chase, AMTRUST, First Horizon, Chase Home Financial, Independent Bank, Wells Fargo, SunTrust Mortgage, Warren was never approved to submit loan files to those institutions. None of those institutions have ever come forward and produced any documentation that Warren was approved to submit loan applications to JP Morgan Chase, AMTRUST, First Horizon, Chase Home Financial, Independent Bank, Wells Fargo, SunTrust Mortgage.

Both the PSR and the case agent is speculating at best as to the number of institutional victims.

In addition, there is nothing in the negotiated plea agreement or the discussions leading up to the written plea agreement with the government, that ever suggested there were 10 or more victims in the case.

If *the government knew* during the plea negotiations and when the plea agreement was signed by the parties and when the change of plea took place on January 10, 2012,  that there were more than 10 victims and said nothing, then the government entered into plea negotiations and finalized a plea negotiation which was a signed contract between the parties inducing the defendant in a significant way to enter

into the plea agreement, the plea agreement must be specifically enforced under the contract doctrine of specific enforcement.

As the Supreme Court in Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) held:

> "Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.

As the Ninth Circuit held in United States v. Franco-Lopez, 312 F.3d 984, 989, (9th Cir. 2002):

> "Plea agreements are contractual by nature and are measured by contract law standards. (Citation omitted)  The courts enforce the literal terms of the plea agreement, (Citation omitted) but "construe ambiguities in favor of the defendant," (Citation omitted) ordinarily placing on the government "responsibility for any lack of clarity," (Citation omitted) .... Accordingly, a plea bargain may be enforced through specific performance (Citation omitted)..."

If the government **_did not know_** during the plea negotiations and when the plea agreement was signed by the parties and when the change of plea took place on January 10, 2012,  that there were more than 10 victims and said nothing, then the government entered into plea negotiations and finalized a plea negotiation which was a signed contract between the parties inducing the defendant in a significant way to enter into the plea agreement, the plea agreement must be specifically enforced under the contract doctrine of specific enforcement.

Either interpretation, the government is held to have induced the defendant to enter into the plea agreement upon a significant degree on a promise that there were not more than 10 victims in this case.

Thus, paragraph 35, page 13 of the PSR must be removed, and the plus two(2) points should not be allowed to increase the offense level pursuant to both the Supreme Court and the Ninth Circuit law of plea agreements.

## B

### SUSAN AND RICHARD DAVIS ARE VICTIMS OF NARAS

Defense counsel incorporates in full the argument in I, regarding paragraph 21 on page 10, as if fully set forth herein.

As stated earlier, Susan and Richard Davis are victims of the Naras fund, which was ***not*** what Warren was involved in, both the government and probation agree with that. (See Plea Agreement page 19, lines 13-16' See PSR page 5-6, paragraph 10)

Thus, Susan and Richard Davis are certainly victims of Lee Loomis and Loomis Wealth Solutions, and the Naras fund run by John Hagener. However, they are not legally victims of the wrongful acts Warren committed. Thus, the defense requests they not be considered as a victim of Warren's.

## C

### ACCEPTANCE OF RESPONSIBILITY

The denial of acceptance of responsibility has been a moving shifting argument

for the government and probation. Probation's argument can only come from the information provided to it by the government. At first, in the draft PSR report the denial of acceptance of responsibility was because:

> "This failure to assist in the recovery of those funds, coupled with the fact that he fled during the investigation of his criminal conduct, demonstrates a lack of acceptance of responsibility and remorse."

However, the denial of acceptance of responsibility in the final PSR, totally changed in its stated reason. Primarily because Warren had offered the government for years after his arrest to debrief on the case, with the government declining, and primarily because Warren was debriefed on June 25, 2012, probation had to change its stated reasons in the PSR for the denial of acceptance of responsibility.

As discussed above, the final PSR now grabbed onto defense counsel's legal argument about TBW and the contract law between TBW and Triduanum , the implied covenant of good faith and fair dealing in all contracts and the PSR leaving that out of the information and only including that Warren and the principals at Triduaum promised to use best efforts and act in good faith in their business dealings with TB&W, when in fact the law says both Triduanum and TB&W are to do that. That should have been included in the PSR, it was not, it was brought out by defense counsel, and then grabbed on by probation as the defendant himself not accepting responsibility as stated in the final PSR:

"However, in his informal objections, he now appears to be recanting as he states that since TB&W was a fraudulent entity, and that all funds exchanged between him (defendant) and TB&W were proceeds of that fraud, he (defendant) could not have "stolen" the funds and should not be held responsible payment (sic) of restitution. His position violates many aspects of the plea agreement and demonstrates he (defendant) has not accepted responsibility for his actions.

"Also, in his formal objections, the defendant objected to the recommendation that no reduction for acceptance of responsibility be granted based on his failure to disclose the whereabouts of the money and gold, and the fact that he fled the country while under investigation. This pre-indictment conduct is important in analyzing the defendant's level of acceptance, especially now in light of his position that he can not be guilty of stealing from a fraudulent entity, because it demonstrates he (defendant) has never truly accepted responsibility for his actions and is unrepentant about his conduct. Therefore, no reduction is recommended."

The PSR missed the point of the TBW discussion and the law of the implied covenant of good faith and fair dealing in all contracts. In any event, the reasoning now is not what was in the draft PSR, but now the reasoning is the defendant has recanted.

# I

## THERE HAS NEVER BEEN A RECANTING OF WARREN'S ACCEPTANCE OF RESPONSIBILITY

The Ninth Circuit in a recent case, United States v. Ramos-Medina, 682 F.3d

852, 859 (9th Cir. 2012) held:

> "The Sentencing Guidelines allow district courts to grant a two-level downward adjustment to a defendant who "clearly demonstrates acceptance of responsibility for his offense. (Citation omitted) The defendant bears the burden of showing that he has accepted responsibility for his actions. (Citation omitted)

The First Circuit in United States v. McLaughlin, 378 F.3d 35, 38 (1st Cir. 2004),

held:

> "In gauging whether a defendant has accepted responsibility, a sentencing court may appropriately consider whether he has voluntarily ceased all participation in criminal activity. (Citation omitted) It follows that when a defendant commits new offenses after having been charged and those offenses reflect adversely on the sincerity of the defendant's avowed contrition, the sentencing court may treat the commission of those offenses as an indication that the defendant has not accepted responsibility for the original crime."[14]

At pages 39-40, the McLaughlin Court states what district court's can use as

guideposts for evaluating acceptance of responsibility:

> "Although the entry of a guilty plea prior to trial is impressive evidence of

---

[14]Such is NOT the case here as Warren has not committed any new offenses after being arrested and charged with the Indictment. Warren was arrested on February 10, 2009, the Indictment was filed on March 12, 2009, Warren's first acceptance of responsibility letter to AUSA Carlberg was within 20 days of the February 10, 2009 arrest, which was prior to the Indictment being filed.

acceptance of responsibility, it does not automatically entitle a defendant to the credit. (Citation omitted) The sentencing court must still find that the defendant exhibits "candor and authentic remorse" as opposed to mouthing "a pat recital of the vocabulary of contrition."

"The Sentencing Commission has provided guidance for courts charged with determining whether heartfelt remorse exists. (Citation omitted)  One factor is whether the defendant "voluntarily has terminated or withdrawn from criminal conduct or associations."[15] We note, too, that courts regularly consider a defendant's *favorable* pre-plea conduct in granting downward adjustments for acceptance of responsibility."[16]

Continuing at page 40, the McLaughlin Court states the position on the further reduction of one more level:

"Timely acceptances of responsibility already are rewarded by a provision that allows for an additional one-level reduction if the defendant "(1) timely provid[es] complete information to the government concerning his own involvement in the offense; or (2) timely notif[ies] authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently."[17]

Here, the defendant's timely acceptance of the negotiated plea agreement met all of the qualifications for the extra one (1) point reduction for timely acceptance of

---

[15]There is no question Warren meets this test.

[16]The Court has been provided, significant evidence of both pre-plea conduct and post plea conduct demonstrating in real life terms, Warren's true commitment to a life free from criminal behavior. Warren is not and has not patted a recital of words for acceptance of responsibility.

[17]Neither the draft or final PSR allows the reader to read anything about the acceptance of responsibility the defendant did within 20 days of being arrested; nor about the 4 offers to be debriefed by the government regarding the case and money, which was only accepted *after* the defense made a specific issue of this lack of debriefing by the government in the first informal objections on May 29, 2012.

responsibility[18].

Even using the recent Ninth Circuit case of United States v. Mara, 523 F.3d 1036, 1038 (9th Cir. 2008), which held:

> "We have previously held that ongoing criminal activity *related* to the offense of conviction is sufficient to negate a defendant's acceptance of responsibility for the crime. In addressing this question of first impression with respect to *unrelated* conduct, we hold that a district court may, in its discretion, consider criminal activity unrelated to the offense of conviction in evaluating whether a defendant has voluntarily withdrawn from criminal conduct for purposes of granting a sentencing reduction for acceptance of responsibility.[19]

Here, Warren has no related or unrelated criminal conduct after his arrest in February 2009. Warren has demonstrated his total withdrawal from criminal conduct and associations to allow this Court to find he is entitled to acceptance of responsibility.

A list of the timely actions by Warren in accepting responsibility:

1- within 20 days after arrest Warren writes a letter of apology to AUSA Carlberg;

2- April 6, 2009, Warren sends a 13 page proffer regarding the entire case, including a spread sheet of proceeds distribution and an offer to meet with the government regarding the money;

3-June 13, 2012, offer to settle globally the case and an offer to meet with

---

[18]The defendant has provided to the government acceptance of responsibilities, proffers, meetings with debriefings.

[19]Warren passes both the tests of ongoing related and ongoing unrelated conduct, since Warren was engaged in neither, and as the sealed documents demonstrate beyond the preponderance of evidence standard necessary for sentencing hearings, Warren's conduct has terminated and withdrawn from criminal conduct or associations.

the government regarding all activities and the money;

4- December 15, 2012, plea agreement reached and an offer to meet with the government regarding all activities and the money;

5- interview with probation and acceptance of responsibility;

6- documents submitted to probation to forward to Court demonstrating acceptance of responsibility;

7- May 29, 2012, first informal objections, and an otter to meet with the government regarding all activities and the money.

The defendant has never recanted.

Probation misunderstood defense counsel's TBW good faith and fair dealing argument as pointed out above in the use of the wording "I" in the informal objections paragraphs 16 and 15:

> "16- In addition, I provide probation with information regarding Taylor Bean Whitaker (TBW), which ceased its operations on August 5, 2009. On August 14, 2009, TBW ceased all business operations and terminated all employees at its headquarters in Ocala, Florida.

The "I" provide, and the rest of the information is from defense counsel and not from the defendant Warren. There is no other interpretation to that beginning or what defense counsel was doing. Further, probation had before it, in the previous paragraph, paragraph 15, the very same wording and language, but either choose to ignore that it came from defense counsel and not the defendant or decided to take two different interpretations with the very same language, in any event the use of the "I" was clear that the information is coming from counsel:

15- On Thursday, May 31, 2012, I learned for the first time the following

facts which the defense contends bears on its argument in support of the 3 (three) point reduction for acceptance of responsibility:In United States v. Gililland, et al, CR-S- 08-376--EJG, Nicole Magpusao received at least the two (2) points off on her PSR for acceptance of responsibility (it may have been the entire three (3) points off but I can not make that representation). I have not read or seen Ms. Magpusao's PSR, however, I understand, again I am writing for clarification, Hugo Ortiz did the PSR and granted the acceptance of responsibility.

I further understand that Nicole Magpusao was a fugitive, traveling internationally to two (2) countries, Columbia and Spain for over 11 months. My understanding is that a search warrant was served on the home she resided at with her husband, Garrett Gililland in Chico in June of 2008, and after then fled internationally prior to an Indictment being filed by the government.

Further, Nicole Magpusao, who was not in custody in Spain, did fight extradition for approximately 11 month and that the United States expended time, effort and money in getting Nicole back to the United States.

Thus, the reason I am writing. If these facts are true, then the granting of acceptance of responsibility for a fugitive on the run internationally that fought extradition for approximately 11 months and the denial of granting acceptance of responsibility for Mr. Warren being out of the country for approximately 8 days, February 3, 2009 (the date he left there was no arrest warrant or criminal complaint or Indictment filed,

this did not happen until February 5, 2009) to his arrest early on February 11, 2009. Mr. Warren did not fight extradition from anywhere, appears to be a contradiction and selective application in the Eastern District.

Thus, if the facts are true, then there could be an argument of unequal treatment of granting acceptance of responsibility to individuals in the Eastern District.

The providing of Probation with correct factual information and correct law, is in no way a recantation of acceptance of responsibility by the defendant. No case so holds.

## II

## NINTH CIRCUIT CASE OF HUNT

The case that is the closest to Warren's case in the Ninth Circuit.

The Ninth Circuit in United States v. Hunt, 656 F.3d 906, 911 (9th Cir. 2011), found no error by the district court when it  awarded the defendant a two point reduction for acceptance of responsibility *even* after the defendant used a false identity and fled the jurisdiction *after being arrested*[20].

## III

## PRE-INDICTMENT ACTIVITY TO
## DETERMINE ACCEPTANCE OF RESPONSIBILITY
## WITH DEFENDANT OUT OF THE COUNTRY

Even if the Court focuses on the draft PSR as the reasoning probation denies acceptance of responsibility, this reasoning does not find support in the Circuits.

The probation office in its first denial of acceptance of responsibility stated in the draft report the following as the justification to deny acceptance:

> "However, the fact remains that $6,000,000 in stolen funds remains unaccounted for. Given the suspicious circumstances of his (defendant) trip to Lebanon, it is likely the funds are stashed there and will be available to him upon his release. This failure to assist in the recovery of those funds, coupled with the fact that he fled during the investigation of

---

[20]Christopher Warren never fled after being arrested. In fact, there was no Indictment filed, sealed or otherwise, when Christopher Warren left the United States. So factually, Hunt is much more severe in its facts than this case, and yet the District Court in Hunt applied a two point reduction for acceptance of responsibility.

his criminal conduct, demonstrates a lack of acceptance of responsibility and remorse. Therefore, no reduction is recommended."

First, probation obtained this information from only one source, the government. Second, the government gave only that information which was detrimental to the defendant obtaining the two (2) points off for acceptance of responsibility[21]. As the Ninth Circuit in U.S. v. Ellis, 641 F.3d 411, 417 (9th Cir. 2011) held:

> "The government may breach an agreement when it attempts to influence the district court "to impose a harsher sentence than the one to which the government agreed in the plea agreement to recommend. (Citation omitted)  It may also breach an agreement when it "contradicts[a] recommendation with statements indicating a [different] preference." (Citation omitted) Where the government promises to abstain from making a sentencing recommendation, it may not argue that "its inadvertent breach [in making a recommendation] is immaterial," because the fact that "the breach of agreement was inadvertent does not lessen its impact. (Citation omitted)"

Here, in the draft PSR report, the government supplied the probation office with inaccurate information to "influence the district court 'to impose a harsher sentence

---

[21]The government took great care, caution and deliberation in the plea agreement to cite two Ninth Circuit cases: United States v. Allen, 434 F.3d 1166, 1175 (9th Cir. 2006) and cited it for the rule of law: "...the government has a duty of candor to the Court." The Ninth Circuit did not hold that the government has a duty of candor to the Probation Officer, however, there is little doubt that the government, on ethical considerations, be honest and forthcoming with the Probation Officer. Allen dealt with only the issue of answering the District Court's questions, the issue before it was not answering questions from Probation. United States v. Block, 660 F.2d 1086, 1090-1092 (5th Cir 1981) stands for the rule of law that the government can provide relevant information or to correct misstatements. Here, the draft report is the first written document on the case from probation. By the time probation had written the first draft report, the government should have provided probation with the April 6, 2009 proffer, the June 13, 2010 offer to be debriefed and the December 15, 2011, offer to debrief regarding the money. There was no misinformation to correct, and the relevant information was that Warren wanted to, offered to assist in any way regarding recovery of the money, the government had rejected all those offers.

than the one to which the government agreed in the plea agreement to recommend'", by

providing materially false information that Warren "failed to assist in the recovery of

those funds". The government knew that statement to be false[22]. The government knew

by making that false statement to probation, that probation more likely than not would

not recommend acceptance of responsibility, which would then be the recommendation

to the Court. This then would then take the government off the hook from making the

motion for the third point of acceptance.

This failure of the acceptance of responsibility would increase Warren's sentence

and be a breach of the plea agreement by the government since the plea agreement

stated that the government would not oppose a three-level reduction if the probation

office recommends. The way the government influences and thus, breaches the

recommendation of 175 months, is that it is the government that provides the probation

office with the information, wrong information, that Warren has failed to assist the

government in recovery of the funds. The government never asked Warren after his

arrest, never took Warren up on all of his offers to be debriefed, and then misstated this

_____

[22]The laundry list of co-operation and acceptance of responsibility along with assisting in the recovery of assists has been well documented before the Court: September 2, 2008; December 24, 2008; December/Janaury 2008/09 meetings with AUSA Carlberg/IRS Special agent Fitzpatrick; January 2009 meeting with AUSA Carlberg/IRS Special Agent Fitzpatrick being interviewed on documents that were produced pursuant to Subpoena on how they demonstrate fraud, a "Treasure Trove of information"; with 20 days of being arrested on February 10, 2009, an apology letter to the government; April 6, 2009, a 13 page proffer letter delivered to the government; June 13, 2010, attempt at a global settlement and to be interviewed on all aspects including recovery of funds; December 15, 2011, reach plea agreement and offer to be debriefed on all aspects of the case including money; May 29, 2012, offer to be debriefed on all aspects of the case including money.

to probation.

The fleeing by Warren during the investigation, should not normally be considered in the analysis for acceptance of responsibility as demonstrated by both the First Circuit in  United States v. McLaughlin, 378 F.3d 35, 41 (1st Cir. 2004) and the Third Circuit in United States v. Ceccarani, 98 F.3d 126 (3rd Cir. 1996).  Returning to the First Circuit decision in United States v. McLaughlin, 378 F.3d 35, 41 (1st Cir. 2004), the Court held:

> "As a general matter, it is true that courts cannot go back limitlessly in time in assessing acceptance of responsibility (Citation omitted) Normally, the lodging of a federal charge marks the commencement of the relevant time frame. (Citation omitted) (explaining that a "defendant must be on notice that the federal government has an interest in his or her affairs before the acceptance-of-responsibility guideline comes into play") (footnote omitted) The rationale for using this milestone is that the clock should start to run no later than the time that the defendant has been put on notice, by the filing of a formal charge, that federal prosecutors have taken an interest in his conduct."

The Third Circuit in United States v. Ceccarani, 98 F.3d 126, 130 (3rd Cir. 1996), the court stated:

> " Thus, the Guidelines appropriately give the sentencing judge the discretion to consider post-indictment unlawful conduct in determining whether to grant the section 3E1.1reduction for acceptance of responsibility".

There was no arrest warrant, no criminal compliant filed (sealed or unsealed), there was no Indictment filed (sealed or unsealed) at the time Warren left the United States. Thus, the acceptance of responsibility clock had not started when Warren left.

Once Warren was arrested in the United States, five (5) days after the criminal complaint had been filed, he accepted full responsibility for all of his actions and discontinued all criminal conduct and associations with the criminal element.

The following is research done by the defense on the issue of acceptance of responsibility and the defendant being a fugitive.

## SECOND CIRCUIT
## ACCEPTANCE OF RESPONSIBILITY
## AND FUGITIVE

The Second Circuit has only one case, that defense counsel can find, that deals with acceptance of responsibility and being a fugitive, United States v. Loeb, 45 F.3d 719, 722 (C.A. 2nd N.Y., 1995), however the facts are totally different than the facts here. Defendant Loeb was out on bail pending sentencing when he left new York, fled to Arizona and was part of a Nationwide manhunt for 39 days. Defendant Loeb was arrested 39 days after fleeing pursuant to a bench warrant and returned to New York. Mr. Warren left the country prior to any arrest warrant, prior to any Indictment being filed, and there was no bench warrant out for his arrest. Further, Mr. Warren never fought any extradition[23]. The Loeb case is of no assistance to either probation or the

---

[23]This Court need look no further than the Eastern District Case of United States v. Garret Gililland, III, et al, CR-S-08-376–EJG. In that case, Garret Gililland, III, had search warrants issued and served on his residence's in both Paradise and El Dorado Hills, California. Defendant Gililland was detained at his El Dorado Hills house and interviewed, waiving Miranda and without a lawyer, for about 5 hours. During that interview Defendant Gililland gave information regarding Anthony Sims and agreed to co-operate with the government. Two days later, Defendant Gililland has Mr. Warren assist hm in typing up Defendant Gililland's first proffer statement for the government. Then Defendant Gililland hires a lawyer, Gililland's lawyer calls the government and tells them Gililland will debrief. Prior to any

1  government.

## FIFTH CIRCUIT
## ACCEPTANCE OF RESPONSIBILITY
## AND FUGITIVE

The Ninth Circuit Rules of Court allow citation to unpublished cases that were

decided on or after January 1, 2007, to the Ninth Circuit. Counsel looked at the local

rules and found no rule prohibiting the citation of unpublished Circuit cases.  (See

Ninth Circuit Federal Rule of Appellate Procedure, Rule 32.1) Using the Ninth Circuit

Federal Appellate Rule as authority with no know counter authority, counsel will

inform the Court of Fifth Circuit unpublished opinions.

In U.S. v. Williamson, 291 Fed. Appx. 595 (C.A. 5 (Tex) 2008) the defendant

escaped from a federal institution while serving a federal sentence for drug trafficking

and committed more drug trafficking crimes for which he pled guilty and was

sentenced. The District Court denied the acceptance of responsibility due to this

behavior.

---

debriefing, Defendant Gililland and his co-defendant wife, Nicloe Magpusao then went on the run to various foreign countries, including Columbia where Defendant Gililland tried to open a nightclub, and finally Stiges, Spain. In Spain, both Defendant Gililland and Magpusao, in the words of AUSA Carlberg, "fought a pitched extradition battle"against their return to the United States. Both defendants were fugitives for 16 months. (See, CR-s-08-376, Docket # 54, Government's opposition to release of defendant Magpusao). The reason the government found out where Gililland was, Mr. Warren assisted the government by sending to Gililland a box of Pringles that was traced to where Gililland was. However, even with all of those facts, the probation office for the Eastern District of California and the U.S. Attorney's office recommended to the District Court a three (3) point reduction for acceptance of responsibility. Defendant Gililland provided no more assistance to the government than Mr. Warren as will be documented below as to the many Indictments filed and State prosecution cases filed due to Mr. Warren's information to the government. The use of valuable resources by government authorities in a foreign country was not an efficient use of government resources.

In United States v. Fisher, 162 F.3d 93 (5th Cir 1998) held that it was not error that the district court reduced Fisher's offense level by two points for acceptance of responsibility and that the probation officer refused to recommend the additional level decrease, because Fisher remained a fugitive for twenty months before pleading guilty. By the time Fisher was arrested, all of his coconspirators had been convicted and the Government had already prepared for trial. Thus, the facts of Warren's case deserve the three point reduction for acceptance of responsibility.

In U.S. v. Chapa-Garza, 62 F.3d 118, 120 and 123 (C.A. 5 (Tex.) 1995), the defendant was serving a federal sentence fro drug smuggling, when he and others escaped from a federal institution in San Antonio, Texas, remaining a fugitive for 41/2 years. The defendant refused to make a statement to the probation officer on advice of counsel, made no statement to the district court at the time of sentencing and the reasoning why probation did not recommend the adjustment for acceptance was because the defendant made no statement or explanation concerning his participation in the escape and he gave no indiction of his willingness to accept responsibility for his criminal conduct.

In U.S. v. Ayala, 47 F.3d 688, 691 (C.A. 5 (Tex.) 1995), the defendant was indicted in 1991 and when he failed to show for a pre-trial hearing he remained a fugitive for about 15 months. The Fifth Circuit case of United States v. Ainsworth, 932

F.2d 358, 363, n. 3 (5th Cir.) holds that subsequent cooperation with law enforcement officers after flight from custody did not warrant an acceptance of responsibility. Again, totally factually different than this case, as there was no arrest warrant, no indictment, no bench warrant and Mr. Warren was not in custody.

In U.S. v. Tremelling, 43 F.3d 148, 152 (C.A. 5 (Tex.(1995), the defendant was a fugitive for over two years and had an obstruction of justice adjustment added, thus the district court did not err in not giving the defendant acceptance of responsibility.

<div align="center">

**SEVENTH CIRCUIT**
**ACCEPTANCE OF RESPONSIBILITY**
**AND FUGITIVE**

</div>

In U.S. v. Mount, 675 F.3d 1052 (C.A. 7 (Ind.) 2012), the defendant fled while awaiting trial for possession of a gun by a felon and was apprehended three (3) months later, pled guilty, was sentenced and received the two (2) points for acceptance of responsibility but the district court denied the third point. The Seventh Circuit reversed finding that the language in 3E1.1(b) is mandatory once the three subsection (b) conditions are met. Even here, with a past criminal felony record, with an Indictment filed, the defendant on pre-trial release conditions, and being a fugitive for 3 months, the defendant still was awarded the acceptance of responsibility.

In U.S. v Fudge, 325 F.3d 910, 916, 923 (C.A. 7 (Wis) 2003), one of a multi-defendant cocaine gang, defendant Raines, was Indicted on February 1, 2001, warning

<div align="center">48</div>

fellow co-conspirators to destroy evidence. Defendant Raines was arrested on August 1, 2001. Defendant Raines then escaped and 10 days later was apprehended in a room with a TEC 9 submachine gun. The district court adjusted his base offense level with obstruction of justice and denied acceptance of responsibility. The Seventh Circuit upheld the district court especially since defendant Raines did not demonstrate that his case was extra-ordinay so as to justify a downward acceptance of responsibility.

<div align="center">

**NINTH CIRCUIT**
**ACCEPTANCE OF RESPONSIBILITY**
**AND FUGITIVE**

</div>

The Ninth Circuit in U.S. v. Collins, 61 F.3d 1379, 1386 (9th Cir. 1995) did not find error when the district denied a two level reduction in acceptance of responsibility when the defendant had been convicted in the late 1970's of several felonies, sentenced and released. The defendant was arrested in Illinois in 1991 on misdemeanor theft charges. A bench warrant was issued when defendant failed to appear for trial. On June 15, 2993, the defendant was stopped by Montana sheriff after reports he had fired a gun in a bar. The sheriff learned of the outstanding arrest warrant, but released the defendant and returned his guns when it appeared Illinois would not extradite and the complaining witness would not sign a complaint. Then ATF was notified by a concerned citizen that the defendant had weapons in his trailer in early 1994. A search turned up weapons, and defendant was arrested, after concealing himself in his father's

house. The defendant went to trial and the district court did not find this to be the "rare situation [] ... [in which] a defendant goes to trial to assert and preserve issues that do not relate to factual guilt".

These facts are not similar to Warren's case. Warren has no prior convictions, and reached a timely plea agreement with the government.

## DISTRICT OF COLUMBIA CIRCUIT
## ACCEPTANCE OF RESPONSIBILITY
## AND FUGITIVE

In U.S. v. Reeves, 586 F.3d 20, 296, 297, 300  (C.A.D.C. 2009), defendant Reeves was Indicted on drug charges in March 2006, which were dismissed on April 27, 2006 and a new federal charges filed and defendant to appear on June 5, 2006. Defendant Reeves failed to appear until he was arrested 11 months later on the issued bench warrant. At sentencing, the district court increased the offense level for obstruction of justice but also decreased by two points for acceptance of responsibility but denied the third point for the plea not being timely in that in light of his 11 month fugitive status the government had to expend resources to apprehend the defendant and expend more resources to start the process again. This was affirmed.

# IV
## AWARDING GILILLAND ACCEPTANCE
## JUSTIFIES AWARDING WARREN ACCEPTANCE

To avoid sentencing disparity in the Eastern District, awarding of acceptance of responsibility to Garret Gililland in case United States v. Gililland, CR-S-08-376–EJG, would strongly suggest awarding acceptance of responsibility to Warren to avoid a due process and equal protection violation under the Advisory Sentencing Guidelines with their stated purpose being to have uniformity for similar acts across the nation.

Here is analysis of Gililland and Warren:

|  | Gililland | Warren |
|---|---|---|
| 3 point acceptance of responsibility in PSR | yes | no |
| type of fraud | Wire/mortgage | Wire/mortgage |
| loss range | 2.5-2.7 million | 7-20 million |
| victims | 10-50 | 8/13[24] |
| leader/organizer | yes | yes |
| promised to co-operate with government | yes | yes |
| initial co-operation led to Indictments | no | yes (4) |
| flight overseas after promise to co-operate | yes | yes |

---

[24]The defense argues 8 in the objections, the PSR argues 13

51

| | | |
|---|---|---|
| assist government in locating Gililland | n/a | yes |
| assist government in locating Warren | no | n/a |
| fight extradition to United States | yes/12 months | no |
| timeliness of acceptance | 30 months | 20 days |

Warren assisted the government in locating Gililland, who then fought, along with his wife, a pitched battle not to be extradited from Spain. Under the analysis of the material criteria for acceptance as between Gililland and Warren, to allow Gililland acceptance and deny Warren, would be a denial of equal and fair treatment of similarly situated defendants which the Advisory Sentencing Guidelines are designed to prevent.

When you add in post-arrest activities to demonstrate acceptance of responsibility, Warren far exceeds Gililland, starting with all of the education and programs completed by Warren, which Gililland does not have, to the completion of articles that have been published.

## D
## BREACH OF PLEA AGREEMENT BY THE GOVERNMENT ALLOWS FOR SPECIFIC PERFORMANCE

The government has breached the plea agreement in two ways.

First, the government breached the plea agreement regarding the PSR final report argument of more than 10 victims.

Second, the government breached the plea agreement regarding the PSR final report of denying acceptance of responsibility.

# I

## BREACH OF THE PLEA AGREEMENT BY
## THE 10 OR MORE VICTIMS

Exhibit C speaks louder, speaks clearer, speaks with more authority than any argument the defense could make as to how the government, which includes the federal agents, have breached the plea agreement prior to ever stepping into the Sentencing Court.

The government, from supervisors to AUSA's to federal agents, specifically knew during the most critical and delicate time of the plea negotiations with the defense that there was no evidence to support a guideline enhancement of 10 or more victims. For the government to create Exhibit B after the December 22, 2011 e mail, Exhibit C, after the draft PSR and prior to the final PSR, is shocking. It is a win at all costs agenda. It is against the Supreme Court of the United States ruling.

As the Supreme Court in Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) held:

> "Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.

As the Ninth Circuit held in United States v. Franco-Lopez, 312 F.3d 984, 989, (9th Cir. 2002):

> "Plea agreements are contractual by nature and are measured by contract law standards. (Citation omitted)  The courts enforce the literal terms of the plea agreement, (Citation omitted) but "construe ambiguities in favor of the defendant," (Citation omitted) ordinarily placing on the government "responsibility for any lack of clarity," (Citation omitted) .... Accordingly, a plea bargain may be enforced through specific performance (Citation omitted)..."

As the Ninth Circuit in U.S. v. Ellis, 641 F.3d 411, 417 (9th Cir. 2011) held:

> "The government may breach an agreement when it attempts to influence the district court "to impose a harsher sentence than the one to which the government agreed in the plea agreement to recommend. (Citation omitted)  It may also breach an agreement when it "contradicts[a] recommendation with statements indicating a [different] preference." (Citation omitted) Where the government promises to abstain from making a sentencing recommendation, it may not argue that "its inadvertent breach [in making a recommendation] is immaterial," because the fact that "the breach of agreement was inadvertent does not lessen its impact. (Citation omitted)"

Everyone in the government signed off on the plea agreement, supervisors, federal agents, AUSA's. No one on the government side was in the dark, no one on the government side was without full knowledge of the critical and delicate plea negotiations.

Any yet, the government for over a month, has remained silent. The government for over a month has never attempt to correct the misinformation provided probation.

1   The government never provided probation with the December 22, 2011, e mail.

2

3      Probation blindly accepted the government's created Exhibit B, without

4   questioning its veracity. Probation never questioned the government as to what, if any,

5

6   representations were made during the plea negotiations with the defense. Probation

7   never did independent investigation as Congress has set Probation up to do, regarding

8   Exhibit B. A simple question of the government was never asked.

9

10      Thus the government supplying probation with Exhibit B, knowing full well that

11

12   during the plea negotiations in December 2001 with the defense, the government (from

13   supervisors to AUSA's) made the following critical and material  representation to the

14   defense that induced reliance of the defense to enter into the plea agreement:

15

16         "I will talk to Rob and Paul in the morning dn we will get you an answer.
          We are leaving out the number of victims because we have fewer than 10
17         total lender victims...."

18   The government not only knew that the potential enhancement of 10 or more

19

20   victims was critical and material to the negotiations with the defense, but also

21   affirmatively represented that the government has fewer that 10 total lender victims.

22

23   The government made an affirmative representation during the critical point of plea

24   negotiations that the government did not have the evidence to support the enhancement

25   of 10 or more victims.

26

27      Then, to the horrific shock of the defense, probation in the final PSR not only

28

55

includes the enhancement of 10 or more victims, but also produces a document made

up by the FBI[25] case Agent to support what probation has included.

There is only one logical conclusion as to why this misleading information was

provided to probation, as the Ninth Circuit in U.S. v. Ellis, 641 F.3d 411, 417 (9th Cir.

2011) held:

> "The government may breach an agreement when it attempts to influence
> the district court "to impose a harsher sentence than the one to which the
> government agreed in the plea agreement to recommend. (Citation
> omitted) It may also breach an agreement when it "contradicts[a]
> recommendation with statements indicating a [different] preference."
> (Citation omitted) Where the government promises to abstain from making
> a sentencing recommendation, it may not argue that "its inadvertent breach
> [in making a recommendation] is immaterial," because the fact that "the
> breach of agreement was inadvertent does not lessen its impact. (Citation
> omitted)"

The government has breached the plea agreement before even walking into the

Sentencing Court. Further, the defense relying on the plea negotiations in December

2011, was either mislead, or the document (Exhibit B) was created after the

government believed Warren might have the Court grant Warren acceptance of

responsibility. If that were to occur, then the government would be faced with the

dilemma of responding to the Court's question of whether the government would make

the motion for the third point off for acceptance. All of this leads to the parties plea

---

[25]This document probably was created sometime after first informal objections made by the
defense on May 29, 2012 and the final PSR report received by the defense on August 3, 2012. It did not
exist at the critical and delicate plea negotiations with the defense on December 22, 2011.

agreement of 175 months being not only  reasonable and fair but also supported by the

evidence of what the government could actually prove and what it could not.

Exhibit B was created after the good faith and fair dealing of the defense in

reaching the plea agreement. The government promised and induced the defense by it's

representations proved by Exhibit C, to enter into the plea agreement. Now the

government has created Exhibit B, which is not what the government promised and

represented in the plea negotiations.

The government has breached the plea agreement.

The Court should specifically enforce the plea agreement and sentence Warren to

175 months, if for no other reason than to send the government and federal agents a

message, what the Supreme Court rules is the law, and neither the government nor the

federal agents can go against the Supreme Court ruling: the Supreme Court in

Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971)

held:

> "Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.

## II

## BREACH OF THE PLEA AGREEMENT BY
## MATERIALLY INFLUENCING THE COURT TO IMPOSE
## A HARSHER SENTENCE

The government provided probation with information that probation used to write the draft report. The draft report denied acceptance of responsibility to Warren on inaccurate, misleading and false information that only the government could provide. The government knows that the Court at sentencing at some point adopts the PSR findings, either in whole or in part, and adopts the recommendations to offense level, either in whole or in part. The government knows that if Warren is denied acceptance of responsibility, the 175 month recommendation of the parties, will be at odds with whatever the PSR recommends. In addition, if the PSR does not recommend acceptance of responsibility, then the government does not have to address the question from the Court of whether the government moves for the third point down for acceptance.

The governments knows the only way the parties can recommend the 175 month sentence to the Court is if there is acceptance of responsibility[26] and no increase in the offense level for 10 or more victims. Thus, the government supplying probation with information that:

---

[26]And no offense level increase for "likely" 10 or more victims in the case.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> "This failure to assist in the recovery of those funds, coupled with the fact
> that he fled during the investigation of his criminal conduct, demonstrates
> a lack of acceptance of responsibility and remorse."

was incorrect, misleading and false information in light of Warren's repeated attempts

be interviewed on the entire case and money by the government at least four (4) times.

There is no other reasonable way probation could have concluded: "This failure to

assist in the recovery of those funds", unless the information came from the government

or government agents.

Thus the government supplying probation with Exhibit B, knowing full well that

during the plea negotiations in December 2001 with the defense, the government (from

supervisors to AUSA's) made the following critical and material  representation to the

defense that induced reliance of the defense to enter into the plea agreement:

> "I will talk to Rob and Paul in the morning dn we will get you an answer.
> We are leaving out the number of victims because we have fewer than 10
> total lender victims...."

The government not only knew that the potential enhancement of 10 or more

victims was critical and material to the negotiations with the defense, but also

affirmatively represented that the government has fewer that 10 total lender victims.

The government made an affirmative representation during the critical point of plea

negotiations that the government did not have the evidence to support the enhancement

of 10 or more victims.

Then, to the horrific shock of the defense, probation in the final PSR not only

includes the enhancement of 10 or more victims, but also produces a document made up by the FBI[27] case Agent to support what probation has included.

There is only one logical conclusion as to why this misleading information was provided to probation, as  the Ninth Circuit in U.S. v. Ellis, 641 F.3d 411, 417 (9th Cir. 2011) held:

> "The government may breach an agreement when it attempts to influence the district court "to impose a harsher sentence than the one to which the government agreed in the plea agreement to recommend. (Citation omitted)  It may also breach an agreement when it "contradicts[a] recommendation with statements indicating a [different] preference." (Citation omitted) Where the government promises to abstain from making a sentencing recommendation, it may not argue that "its inadvertent breach [in making a recommendation] is immaterial," because the fact that "the breach of agreement was inadvertent does not lessen its impact. (Citation omitted)"

The government has breached the plea agreement before even walking into the Sentencing Court. Further, the defense relying on the plea negotiations in December 2011, was either mislead, or the document (Exhibit B) was created after the government believed Warren might have the Court grant Warren acceptance of responsibility. If that were to occur, then the government would be faced with the dilemma of responding to the Court's question of whether the government would make the motion for the third point off for acceptance. All of this leads to the parties plea

---

[27]This document probably was created sometime after first informal objections made by the defense on May 29, 2012 and the final PSR report received by the defense on August 3, 2012. It did not exist at the critical and delicate plea negotiations with the defense on December 22, 2011.

60

agreement of 175 months being not only  reasonable and fair but also supported by the

evidence of what the government could actually prove and what it could not.

Exhibit B was created after the good faith and fair dealing of the defense in

reaching the plea agreement. The government promised and induced the defense by it's

representations proved by Exhibit C, to enter into the plea agreement. Now the

government has created Exhibit B, which is not what the government promised and

represented in the plea negotiations.

The government has breached the plea agreement.

The Court should specifically enforce the plea agreement and sentence Warren to

175 months, if for no other reason than to send the government and federal agents a

message, what the Supreme Court rules is the law, and neither the government nor the

federal agents can go against the Supreme Court ruling: the Supreme Court in

Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971)

held:

> "Those circumstances will vary, but a constant factor is that when a plea
> rests in any significant degree on a promise or agreement of the
> prosecutor, so that it can be said to be part of the inducement or
> consideration, such promise must be fulfilled.

### III
### THE GOVERNMENT BREACHED THE PLEA AGREEMENT
### BY INFLUENCING PROBATION TO DENY
### ACCEPTANCE OF RESPONSIBILITY

On June 25, 2012, Warren was interviewed by probation, federal agents, and the

AUSA. In probations responses to Warren's modified informal objections, dated

August 1, 2012, on page 4, the third full paragraph on the page, probation writes

when the AUSA, the federal agents and probation left the interview/debriefing of the

defendant[28]:

> "The AUSA, the agents and I left the meeting feeling the defendant was
> being less than forthcoming about the location of the assets.

The PSR is not a joint venture of the government and probation and federal

agents. The PSR is to give an independent analysis, not an analysis of shared feelings

about the defendant. The only reason the government and the federal agents would have

[28]This June 25, 2012, meeting with the defendant to discuss locations of all assets, comes after the defendant had made four (4) requests to the government to meet and be debriefed on all aspects of all cases/activities including all assets, which the government failed to accept and acknowledge until the fourth (4th) request made through probation in the informal objections filed on May 29, 2012: First- the defendant had within 20 days of his arrest (arrested on February 10, 2009), send a letter of acceptance of responsibility to the government regarding this case; Second, this June 25, 2012, meeting, comes after the defendant on April 6, 2009, sent a 13 page hand written letter detailing the defendant's complete and total acceptance of responsibility and the location of all assets and a request to be interviewed by the government regarding the entire case, which the government denied for over three (3) years, long before any plea negotiations and probation was involved in the case; Third, this June 25, 2012 meeting comes after the defendant, through defense counsel, sent a letter on June 13, 2010, some two years prior to the plea agreement being finalized, offering to globally settle all cases against the defendant, and a willingness to be debriefed and interviewed regarding all aspects of all cases including all assets, and the government failed to even respond in any fashion to this letter, failed to ever negotiate at all for another two (2) years to resolve this case; Fourth, this June 25, 2012 meeting comes _only_ after defense counsel's informal objections were filed with probation which included the fourth (4th) request to be debriefed/interviewed regarding all aspects of all activities and all assets.

in sharing their opinion on their own beliefs of the truthfulness of Warren, was to influence the PSR report to deny acceptance of responsibility. That influence worked as the final PSR denies acceptance of responsibility, and on entirely different theories than the draft PSR.

Again, there is only one logical conclusion as to why this misleading information was provided to probation, as the Ninth Circuit in U.S. v. Ellis, 641 F.3d 411, 417 (9th Cir. 2011) held:

> "The government may breach an agreement when it attempts to influence the district court "to impose a harsher sentence than the one to which the government agreed in the plea agreement to recommend. (Citation omitted) It may also breach an agreement when it "contradicts[a] recommendation with statements indicating a [different] preference." (Citation omitted) Where the government promises to abstain from making a sentencing recommendation, it may not argue that "its inadvertent breach [in making a recommendation] is immaterial," because the fact that "the breach of agreement was inadvertent does not lessen its impact. (Citation omitted)"

The government has breached the plea agreement and the Court should specifically enforce the plea agreement.

# CONCLUSION

The plea agreement should be specifically enforced by this Court and the defendant sentenced to 175 months, with acceptance of responsibility, without any offense level increase for 10 or more victims. The government has breached the plea agreement, the Court is requested to specifically enforce the plea agreement and sentence Warren to 175 months.

DATED: September 4, 2012          RESPECTFULLY SUBMITTED
                                  LAW OFFICES OF JAMES R. GREINER


                                  /s/ JAMES R. GREINER

                                  _____

                                  JAMES R. GREINER
                                  Attorney for Defendant
                                  Christopher Warren

EXHIBIT A

DEFENDANT CHRISTOPHER WARREN'S

OBJECTIONS TO ADVISORY GUIDELINE

PRE-SENTENCE INVESTIGATION REPORT

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE JOHN A. MENDEZ, JUDGE

---oOo---

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                   No. CR. S-09-121

CHRISTOPHER WARREN,

        Defendant.

_____/

---oOo---

REPORTER'S TRANSCRIPT

ENTRY OF GUILTY PLEA

TUESDAY, JANUARY 10, 2012

---oOo---

Reported by:      KELLY O'HALLORAN, CSR #6660

APPEARANCES


For the Plaintiff:


     BENJAMIN B. WAGNER
     United States Attorney
     501 I Street, Suite 10-100
     Sacramento, CA  95814
     BY:  RUSSELL L. CARLBERG
          Assistant U.S. Attorney

For the Defendant:

     LAW OFFICES OF JAMES R. GREINER
     555 University Avenue, Suite 290
     Sacramento, CA  95825
     BY:  JAMES R. GREINER

1

```
 1              SACRAMENTO, CALIFORNIA

 2         TUESDAY, JANUARY 10, 2012, 9:30 A.M.

 3                   ---oOo---

 4        THE CLERK:  Criminal S-09-121; United States versus

 5   Christopher Warren.

 6        MR. CARLBERG:  Your Honor, good morning.  Russell

 7   Carlberg appearing for the United States.

 8        THE COURT:  Good morning.

 9        MR. GREINER:  Good morning, your Honor.  James Greiner

10   appearing with Christopher Warren who is present in court in

11   custody.

12        MR. CARLBERG:  Your Honor, I have a signed

13   disposition.  May I hand that up to Mr. Vine?

14        THE COURT:  You may.  You mean a signed plea

15   agreement; right?

16        MR. CARLBERG:  Plea agreement.  Sorry, your Honor.

17        THE COURT:  All right.  The parties have provided the

18   Court with a written plea agreement which I understand

19   represents the agreement of the parties.

20        Mr. Greiner, does your client still wish to enter a

21   plea of guilty this morning to Count 25?

22        MR. GREINER:  He does, your Honor.

23        THE COURT:  All right.  Mr. Vine, if you'd administer

24   the oath to Mr. Warren, please.

25        THE CLERK:  Yes, your Honor.  Mr. Warren, can I have
```

2

1    you raise your right hand, please.

2         (Defendant sworn.)

3         THE DEFENDANT:  I do.

4         THE COURT:  All right.  Mr. Warren, I'm informed that

5    you wish to enter a plea of guilty this morning to Count 25

6    of this indictment; is that correct?

7         THE DEFENDANT:  Yes, sir.

8         THE COURT:  You've taken an oath to answer my

9    questions truthfully.

10        MR. CARLBERG:  Your Honor, I hate to interrupt, but I

11   want to make sure the Court's aware that he's also pleading

12   to Count 43, the aggravated identity theft charge.

13        THE COURT:  I'm sorry.  I missed that.

14        Okay.  Count 25 and Count 43; correct?

15        THE DEFENDANT:  Yes, sir.

16        THE COURT:  Okay.  You have taken an oath to answer my

17   questions truthfully.  Your answers will be subject to the

18   penalties of perjury for making a false statement if you do

19   not answer truthfully.  I'm going to ask you a number of

20   questions to make sure that this is a valid plea.  If you do

21   not understand any of the questions that I ask, just let me

22   know, and I'll rephrase them to make sure you understand

23   them.  And if at any time you want to speak your attorney,

24   let me know that, and I'll allow you to do so.

25        Okay?

3

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Let's begin with having you state your

3    correct name for the record.

4          THE DEFENDANT:  Christopher Jared Warren.

5          THE COURT:  And what is your date of birth?

6          THE DEFENDANT:  August 25, 1982.

7          THE COURT:  Have you ever been treated for any mental

8    illness?

9          THE DEFENDANT:  No, sir.

10         THE COURT:  Are you currently under the influence of

11   any alcohol, drugs, or medication?

12         THE DEFENDANT:  No, sir.

13         THE COURT:  Have you taken any drugs, alcohol, or

14   medication, prescription or otherwise, within the last 24

15   hours?

16         THE DEFENDANT:  No, sir.

17         THE COURT:  All right.  Do either counsel know of any

18   reason why the defendant is not competent to enter a plea

19   this morning?

20         MR. CARLBERG:  No, your Honor.

21         MR. GREINER:  No, your Honor.

22         THE COURT:  All right.  Mr. Warren, are you fully

23   satisfied with the representation and advice given to you in

24   this case by your attorney?

25         THE DEFENDANT:  Yes, your Honor.

2

1   you raise your right hand, please.

2        (Defendant sworn.)

3        THE DEFENDANT:  I do.

4        THE COURT:  All right.  Mr. Warren, I'm informed that

5   you wish to enter a plea of guilty this morning to Count 25

6   of this indictment; is that correct?

7        THE DEFENDANT:  Yes, sir.

8        THE COURT:  You've taken an oath to answer my

9   questions truthfully.

10       MR. CARLBERG:  Your Honor, I hate to interrupt, but I

11  want to make sure the Court's aware that he's also pleading

12  to Count 43, the aggravated identity theft charge.

13       THE COURT:  I'm sorry.  I missed that.

14       Okay.  Count 25 and Count 43; correct?

15       THE DEFENDANT:  Yes, sir.

16       THE COURT:  Okay.  You have taken an oath to answer my

17  questions truthfully.  Your answers will be subject to the

18  penalties of perjury for making a false statement if you do

19  not answer truthfully.  I'm going to ask you a number of

20  questions to make sure that this is a valid plea.  If you do

21  not understand any of the questions that I ask, just let me

22  know, and I'll rephrase them to make sure you understand

23  them.  And if at any time you want to speak your attorney,

24  let me know that, and I'll allow you to do so.

25       Okay?

5

1   offense level, loss amount, sophisticated means, leadership

2   and abuse of position of trust.

3        The defendant has stipulated under Section 1B1.2(c) of

4   the guidelines that he has also committed the offenses of:

5        One, false statements in application for passport, in

6   violation of 18 United States Code, Section 1542, that form

7   Counts 41 and 42 of the indictment, and that he has committed

8   conspiracy to commit wire fraud, 18 United States Code,

9   Section 1349, in connection with fraud he committed at Loomis

10  Wealth Solutions and Nationwide Lending Group.  This is

11  stipulated as relevant conduct concerning total losses of

12  over $19 million.

13       The defendant agrees not to argue for any departure

14  under the guidelines.  The defendant agrees not to argue for

15  a variance from the sentencing guidelines.  The defendant has

16  agreed to a sentence of 175 months in custody and 72 months

17  of supervised release to follow release from custody.

18       THE COURT:  Let me ask you a question about that I had

19  when I read the plea agreement.  Who is he agreeing with?

20       MR. CARLBERG:  The government.

21       THE COURT:  Well, it doesn't say that.

22       MR. CARLBERG:  It's a recommendation.

23       THE COURT:  It just says that he agrees to a guideline

24  sentence of 175.  But in your portion of the plea agreement,

25  it says that you'll recommend that he be sentenced to the low

6

1   end of the applicable guideline range.

2        MR. CARLBERG:  They're the same.

3        THE COURT:  What if you're both wrong on the guideline

4   range?  I don't really understand what your agreement is in

5   terms of what you're going to recommend.  And again, it's

6   only a recommendation, and I'll explain that to Mr. Warren

7   since the Court isn't bound by your recommendations.  But

8   what are you two agreeing to?

9        MR. CARLBERG:  We're agreeing to the low end of the

10  guidelines, which is 175 months as calculated by the parties.

11       THE COURT:  Do you agree with that, Mr. Greiner?

12       MR. GREINER:  Yes, your Honor.

13       THE COURT:  It doesn't necessarily say that, but I

14  just want to make sure the record's clear.

15       MR. CARLBERG:  I understand, your Honor.

16       THE COURT:  So both of you think 175 is the low end?

17       MR. CARLBERG:  That's what we think.

18       THE COURT:  Okay.  What if it's not?

19       MR. CARLBERG:  If it's not, then we deal with that

20  with the probative PSR, and the Court can sentence within the

21  guidelines or wherever the Court wants.  The defendant has

22  waived appeal of the sentence up to the statutory maximum.

23       THE COURT:  But what if the low end is 220 months?

24  What's your position then, there's no plea agreement?

25       MR. CARLBERG:  Your Honor, this is --

7

1          THE COURT:  I'm asking Mr. Greiner.  I've seen this
2   happen.
3          MR. GREINER:  The Court has seen it happen, and
4   actually I have seen it happen.  The agreement with the
5   government is that the sentence is at the low end of the
6   guidelines.  We have calculated that to be 175 months.  The
7   Court's question is what if the low end of the guidelines
8   turns out to be 200, 260.
9          THE COURT:  Yeah.
10          MR. GREINER:  That would not be pursuant to the
11   agreement of the parties.  So then the question, as the Court
12   says, as I'm thinking through, does that mean that the
13   agreement is invalid or void?
14          THE COURT:  Yeah.  Can he withdraw his plea?
15          MR. GREINER:  I'm not sure that he could withdraw his
16   plea, but I think that the parties would then have an
17   agreement submitting to the Court that we're agreeing to a
18   175-month sentence which would then be either a variance or a
19   departure, which would then mean we would have to argue a
20   variance or a departure which the plea agreement says we
21   can't argue a variance or a departure.
22          THE COURT:  Right.  It's not an 11(c)(1)(C), so you
23   guys aren't agreeing to a sentence of 175.  You're simply
24   saying this is what we think the guidelines --
25          MR. CARLBERG:  That's correct, your Honor.  And that's

1  how a lot of our plea agreements are phrased.  I understand

2  there's an issue with the language, but --

3       THE COURT:  Well, it's an issue for you because if it

4  turns out that it's a higher low end, what are you going to

5  argue?  Are you going to argue I'm bound by 175?

6       MR. CARLBERG:  Yes, your Honor.  That's how we

7  typically do that.  I've had to do that a number of times.

8       THE COURT:  Okay.  So you're going to argue I should

9  vary?

10       MR. CARLBERG:  No, not necessarily, your Honor.

11       THE COURT:  I'd have to.  If the low end of the

12  guidelines are 220 and you're recommending 175, I'd have to

13  vary.  That's the only way I could impose that sentence.  And

14  I'd have to have a reason for varying.

15       MR. CARLBERG:  That's true, you Honor, but the parties

16  are not allowed to argue for a variance.  The parties are

17  allowed to argue that the plea agreement spells out the terms

18  and what we believe the correct guidelines calculations are,

19  and we're going to stand by that.

20       Now, if probation comes in with something different or

21  the Court agrees it's something different, the Court is free

22  to go higher, obviously, and the Court can impose whatever

23  sentence it wants.  And the Court can use whatever basis it

24  wants to reach that.  But the parties do not have to agree

25  with the Court.  And the Court is not a party to the plea

9

1    agreement, so I don't think that it causes any problem with

2    the plea agreement or with the agreement of the parties.

3    There is a meeting of the minds, and I think I've just laid

4    out what that meeting is.

5           THE COURT:  Okay.  I understand.

6           MR. CARLBERG:  The defendant has also agreed to a

7    restitution order and to a forfeiture order.  He's agreed to

8    waive appeal related to any order of restitution.  The

9    government has agreed to recommend a low end of the

10   applicable guideline range, meaning 175 months, and to

11   dismiss at the time of judgment and sentence the remaining

12   counts of the indictment and not bring additional charges in

13   connection with the defendant's conduct at Loomis Wealth

14   Solutions and Nationwide Lending Group.

15          THE COURT:  Sorry, Mr. Carlberg.  But see, you added

16   language.  The plea agreement says, "The government will

17   recommend that the defendant be sentenced to the low end of

18   the applicable guideline range for his offense as determined

19   by the Court."  When you just said that on the record, you

20   read that as saying:  The government will recommend that the

21   defendant be sentenced to the low end of the applicable

22   guideline range for his offense which is 175 months.

23          MR. CARLBERG:  I'm happy to interlineate "as

24   calculated by the parties" if the Court would prefer.

25          THE COURT:  I just want to avoid this issue where, if

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

10

1    it's higher than 175, your plea agreement says, Judge, I'm

2    bound by a recommendation at the low end.  You do what you

3    need to do, but I'm bound to recommend 250 months.  Judge,

4    you can do what you want with that.

5          Now, when Mr. Greiner hears that, if I'm the defense

6    lawyer, I'm going to say that wasn't our deal, Mr. Carlberg.

7          MR. CARLBERG:  I understand the Court's concern.  I've

8    never done that.  Some of these plea agreements are recycled,

9    and we follow typical language in our plea agreements.  And

10   so I'm happy to make on the record perfectly clear that the

11   agreement is to recommend the low end of the guidelines as

12   calculated by the parties.  And I can interlineate it in the

13   written agreement since the Court's now pointing out that

14   there's a problem with the language, or maybe we should put

15   this over.

16         Do you want to put it over?

17         THE COURT:  It's up to you.  I mean the record is

18   clear now.  That language on page 5 really should be --

19         MR. CARLBERG:  We can go to trial.  Fine.

20         THE COURT:  We're not there.  I'm just trying to make

21   sure that we have an agreement.  I've seen these things fall

22   apart at sentencing.  I want to make sure that Mr. Warren

23   understands, and I'll go through that with him, that I can

24   impose whatever sentence I want.  But I want to make sure he

25   understands what the agreement was between the two of you,

11

1   which is as calculated by the parties, not as determined by

2   the Court.

3          MR. CARLBERG:  That's correct.

4          THE COURT:  Do you agree with that, Mr. Greiner?

5          MR. GREINER:  I'd agree with that, Judge.

6          THE COURT:  Okay.  Then through interlineation on page

7   5 on line 21 and 22, the language will be "as calculated by

8   the parties."  And I'll make that change through

9   interlineation.

10         MR. CARLBERG:  Thank you, your Honor.  We can initial

11   it if you'd like.

12         THE COURT:  Okay.  I'm sorry to put you through this.

13         MR. CARLBERG:  No problem.  Good point.  I appreciate

14   it.

15         THE COURT:  Go ahead.

16         MR. CARLBERG:  Finally, the government has agreed to

17   dismiss at the time of judgment and sentence the remaining

18   counts of the indictment, not bring charges in connection

19   with the defendant's conduct at Loomis Wealth or Nationwide

20   Lending Group, and not to oppose the defendant's request for

21   placement in Lompoc if security classification and space

22   availability accord.

23         Those are the essential terms of the agreement.

24         THE COURT:  Okay.  Mr. Greiner, anything else that you

25   think needs to be put on the record in terms of the essential

12

1   elements of the plea agreement?

2          MR. GREINER:  I think we have it, Judge.

3          THE COURT:  All right.  Mr. Warren, do you understand

4   that those are the terms of your plea agreement with the

5   government?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  Okay.  Has anyone made any other promises

8   or assurances to you of any kind to get you to enter a plea

9   of guilty in this case?

10          THE DEFENDANT:  No, your Honor.

11          THE COURT:  All right.  The offenses to which you are

12   offering a plea of guilty are felony offenses.  If your plea

13   is accepted, you will be found guilty of these offenses.

14   That finding may deprive you of valuable civil rights, such

15   as the right to vote, the right to serve on a jury, and the

16   right to possess any kind of firearm.

17          Do you understand that?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  Are you presently on probation or parole

20   for any other offense?

21          THE DEFENDANT:  No, your Honor.

22          THE COURT:  All right.  As set forth in this plea

23   agreement -- I still need to go through this with you.  On

24   page 8, the maximum penalties.  First, for wire fraud, the

25   maximum sentence that I can impose is 20 years in prison, a

13

1      fine of $250,000, or an alternative minimum fine of the

2      greater of the gain to defendant of the loss caused, a

3      three-year period of supervised release, and a $100 special

4      assessment.  For the aggravated identity theft crime, the

5      maximum sentence that the Court can impose is two years'

6      imprisonment, which is a mandatory consecutive term to any

7      other term of imprisonment, a $250,000 fine, or an

8      alternative minimum fine of the greater of the gain to

9      defendant or the loss caused, a three-year period of

10      supervised release, and a special assessment of $100.

11        Also, you are acknowledging that I can order and

12      impose payment of restitution for the full loss caused by

13      your wrongful conduct.

14        You also are agreeing that the restitution order is

15      not restricted to the amounts alleged in the specific counts

16      to which you are pleading guilty.

17        You also are agreeing that you will not attempt to

18      discharge in any present or future bankruptcy proceeding any

19      restitution that I impose.

20        Also, if you're put on supervised release and you

21      violate the terms of your supervised release, I can revoke

22      your supervised release, and I can require you to serve an

23      additional term of imprisonment.

24        So those are maximum penalties.

25        There are, as we've been discussing, statutory

14

1    sentencing factors and sentencing guidelines that have been

2    issued which the Court is required to consider and follow in

3    imposing the appropriate sentence in a case.

4         Have you had enough time to discuss with your attorney

5    how these advisory sentencing guidelines and statutory

6    sentencing factors might apply to your case?

7         THE DEFENDANT:  Yes, your Honor.

8         THE COURT:  All right.  And do you have a general

9    understanding as to how those guidelines and statutory

10   sentencing factors might apply to your case?

11        THE DEFENDANT:  Yes, your Honor.

12        THE COURT:  All right.  I want you to understand that

13   I'm not able to determine what sentence you're actually going

14   to receive until I've had a chance to review the presentence

15   report, the advisory guidelines, the statutory sentencing

16   factors, and after you, your attorney, and the government's

17   attorney have had an opportunity to speak at your sentencing

18   hearing.

19        It's also important for you to understand that even

20   though the government has agreed to make certain

21   recommendations as to what sentence you should receive and

22   your lawyer has agreed to make a certain recommendation,

23   neither of those recommendations are binding on this Court.

24   And if I don't accept the recommendation, you're still going

25   to be bound by your plea, and you'll have no right to

15

1   withdraw it.

2          Do you understand that?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  Okay.  I also want you to understand that

5   once it's been determined what advisory guidelines apply to

6   your case, I still have the authority in some circumstances

7   to impose a sentence that is greater than those guidelines or

8   less than those guidelines.

9          Do you understand that?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  Okay.  I also want you to understand that

12   parole has been abolished.  So if you are sentenced to

13   prison, you will not be released on parole.

14          You or the government may have the right to appeal any

15   sentence I impose.  However, by entering your pleas of guilty

16   today, there is a waiver provision in this plea agreement in

17   which you are giving up your right to collaterally attack or

18   appeal any or all parts of this plea and/or any sentence I

19   impose.

20          Do you understand that?

21          THE DEFENDANT:  Yes, your Honor.

22          THE COURT:  And, Mr. Greiner, are you satisfied that

23   your client has made a knowing and voluntary waiver of the

24   right to collaterally attack or appeal the plea or sentence?

25          MR. GREINER:  Yes, your Honor.

16

1          THE COURT:  All right.  Mr. Warren, you do have a

2     right to continue to plead not guilty and to have a trial in

3     this case.

4          In addition, you have the following constitutional

5     rights if you continue to plead not guilty:

6          The right to be presumed innocent.  As I mentioned, a

7     trial by jury.  The right to have the government prove your

8     guilt beyond a reasonable doubt.  The right to an attorney at

9     all phases of the proceedings.  The right to present a

10    defense to the charges.  The right to see and hear all

11    witnesses and evidence that would be presented against you.

12    The right to cross-examine those witnesses through your

13    attorney.  The right to use the power of this Court to bring

14    in your own witnesses and evidence in order for you to

15    present your defenses.  The right to remain silent.  And the

16    right to not have your silence or decision to not present

17    evidence at trial used against you.

18         Do you understand your constitutional rights as I've

19    just described them to you?

20         THE DEFENDANT:  Yes, your Honor.

21         THE COURT:  Before I can accept a guilty plea from

22    you, you have to give up each of these constitutional rights.

23         Are you willing to do so at this time?

24         THE DEFENDANT:  Yes, your Honor.

25         THE COURT:  Do you join in the waiver, Mr. Greiner?

17

1    MR. GREINER:  I do, your Honor.

2    THE COURT:  Mr. Carlberg, if you would please state

3 the essential elements of the two offenses so I can be

4 assured the defendant understands the charges.

5    MR. CARLBERG:  Yes, your Honor.  At a trial by jury,

6 the government would have to prove beyond a reasonable doubt

7 each and every element of the two offenses:

8    For wire fraud, first, that the defendant knowingly

9 participated in a scheme and artifice to defraud or in a plan

10 for obtaining money or property by making false promises or

11 statements.

12    Second, that the defendant knew that the scheme was

13 misleading or that the promises or statements were false.

14    Third, that the scheme and/or the promises or

15 statements were material, that is, they had a natural

16 tendency to influence or were capable of influencing a person

17 to part with money or property.

18    Fourth, the defendant acted with the intent to

19 defraud.

20    And, fifth, the defendant used or caused to be used

21 the interstate wires to carry out or attempt to carry out an

22 essential part of this scheme.

23    With respect to the elements of aggravated identity

24 theft, the government would have to prove, first, in addition

25 to the felony offense of making false statements in an

18

1    application for a passport, secondly, that the defendant

2    knowingly transferred, possessed, or used without lawful

3    authority a means of identification of another person,

4    meaning any name or number that may be used alone or in

5    conjunction with any other information to identify a specific

6    individual.

7         THE COURT:  All right.  Mr. Warren, do you understand

8    the elements of the two offenses?

9         THE DEFENDANT:  Yes, your Honor.

10        THE COURT:  Attached to your plea agreement is an

11   exhibit, Exhibit A.  It's the factual basis for your plea.

12   It's lengthy.

13        Have you had enough time to review this exhibit with

14   your attorney, go over it with your attorney?

15        THE DEFENDANT:  Yes, your Honor.

16        THE COURT:  So on pages 17 through 22 of the plea

17   agreement.  Do you, in fact, agree that the facts set forth

18   in this exhibit, that each and every fact is true and

19   accurate?

20        THE DEFENDANT:  Yes, your Honor.

21        THE COURT:  All right.  The Court will accept

22   Exhibit A as the factual basis for the pleas in this case.

23        Okay.  Let's start with Count 25.  The charge is wire

24   fraud, a violation of 18 U.S.C. Section 1343.  It involves

25   the date of January 23rd, 2009.  Sender:  Colonial Bank,

19

1   Birmingham, Alabama.  Recipient:  River City Bank,

2   Sacramento, California.  A $410,831.45 wire transfer.

3            As to that crime charged in Count 25, how do you now

4   plead:  Guilty or not guilty?

5            THE DEFENDANT:  Guilty, your Honor.

6            THE COURT:  All right.  And focusing then on Count 43

7   of the indictment, the charge is a violation of 18 U.S.C.

8   Section 1028A, aggravated identity theft.  The count deals

9   with a crime that occurred on November 26, 2008, identity

10  possessed with name and birth date of Anthony Han Kim,

11  defendants both Warren and Cavell, as set forth in the

12  indictment.

13           As to that charge in Count 43, how do you now plead:

14  Guilty or not guilty?

15           THE DEFENDANT:  Guilty, your Honor.

16           THE COURT:  All right.  It is the finding of the Court

17  in the case of United States versus Christopher J. Warren

18  that the defendant is fully competent and capable of entering

19  an informed plea.  The Court also finds that there is a

20  factual basis for his pleas and that he has made a voluntary,

21  knowing, and intelligent waiver of his constitutional rights.

22  His pleas to Count 25 and Count 43 are therefore accepted,

23  and he is adjudged guilty of those two offenses.

24           All right.  We're going to set sentencing as requested

25  for April 24th, 2012.  A written presentence report will be

20

1  prepared by the probation officer to assist the Court in

2  sentencing.  Mr. Warren, you will be asked to give

3  information for that report.  When you give that information,

4  your attorney can be present if you wish.  You'll be able to

5  read the presentence report before your sentencing hearing,

6  and you and your attorney will be given an opportunity to

7  speak on your behalf at your sentencing hearing.

8       Again, sentencing is set for April 24, 2012, at 9:30

9  in this court.  Mr. Warren is to remain in custody pending

10  judgment and sentencing.

11       See you in April.

12       MR. GREINER:  Thank you, Judge.

13       THE COURT:  Thank you.

14       MR. CARLBERG:  Thank you, your Honor.

15       (Proceedings were concluded.)

16

17

18

19

20

21

22

23

24

25

21

1          I certify that the foregoing is a correct transcript

2    from the record of proceedings in the above-entitled matter.

3

4

5                    /s/ Kelly O'Halloran

6               KELLY O'HALLORAN, CSR #6660

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT B

DEFENDANT CHRISTOPHER WARREN'S

OBJECTIONS TO ADVISORY GUIDELINE

PRE-SENTENCE INVESTIGATION REPORT

**LOOMIS RELATED LOANS SEPTEMBER 2007 THROUGH APRIL 200**
**WHERE C WARREN LIKELY INVOLVED**

| LENDER | # LOANS | # LOCATIONS | GROSS LOAN AMOUNT |
|---|---|---|---|
| COUNTRYWIDE/B OF A | 5 | 3 | $1,347,433 |
| JPMORGAN CHASE | 6 | 4 | $2,072,771 |
| AURORA (LEHMAN) | 6 | 6 | $2,143,085 |
| AMTRUST BANK | 3 | 1 | $696,591 |
| FIRST HORIZON | 16 | 1 | $3,351,592 |
| INDYMAC | 10 | 4 | $3,752,119 |
| FLAGSTAR | 7 | 5 | $1,549,391 |
| CITIMORTGAGE | 82 | 16 | $22,454,687 |
| CHASE HOME FINANCE | 2 | 2 | $714,000 |
| GMAC | 1 | 1 | $215,000 |
| INDEPENDENT BANK | 6 | 1 | $2,734,900 |
| WELL FARGO BANK | 1 | 1 | $344,450 |
| SUNTRUST MORTGAGE | 6 | 2 | $1,633,632 |
| **TOTALS** | **151** N/A | | **$43,009,651** |

EXHIBIT C

# DEFENDANT CHRISTOPHER WARREN'S

# OBJECTIONS TO ADVISORY GUIDELINE

# PRE-SENTENCE INVESTIGATION REPORT

**Jay Greiner**

| | |
|---|---|
| **From:** | "Carlberg, Russell (USACAE)" ███████████████████> |
| **To:** | <jaygreiner@midtown.net>; "Tice-Raskin, Robert (USACAE)" ███████████████ ; |
| **Cc:** | "Hemesath, Paul (USACAE)" ██████████████████ |
| **Sent:** | Thursday, December 22, 2011 12:08 AM |
| **Subject:** | Re: UNITED STATES v. CHRISTOPHER WARREN, Warren Plea Agreement |

I will talk to Rob and Paul in the morning and we will get you an answer. We are leaving out the number of victims because we have fewer than 10 total lender victims. The second change you request is very broad. We have no plans whatsoever to charge him for anything else, but we typically don't make such broad, sweeping promises when we don't even know what is out there.

**From:** Jay Greiner [mailto:jaygreiner@midtown.net]
**Sent:** Thursday, December 22, 2011 01:59 AM
**To:** Carlberg, Russell (USACAE); Tice-Raskin, Robert (USACAE); Hemesath, Paul (USACAE)
**Cc:** Robert Storey ████████████████ ; Jay Greiner <jaygreiner@midtown.net>
**Subject:** UNITED STATES v. CHRISTOPHER WARREN, Warren Plea Agreement

12-21-11

Russell, Robert and Paul

Attahced is a letter authorized by my client to send to the government. It is a short two page letter requesting one math correction and one modification to one sentence.

If the government agrees to the two requests and if the government can get to me the revised plea agreement tomorrow, Thursday, December 22, 2011, I have represented to my client that I will take the revised plea agreement to him for him to sign tomorrow Thursday December 22, 2011 and I will notify the government that my client has signed the revised plea agreement tomorrow. In addition, I will put the revised signed plea agreement in the mail tomorrow, Thursday, December 22, 2011 so that the government receives it by at least next Tuesday, December 27, 2011.

As I mentioned in an earlier e mail, I am available on Tuesday January 10, 2012 for a change of plea and I am not available on either Tuesday January 3 or 17th, 2012 for a change of plea.

Thanks

Jay
224-3597

----- Original Message -----
**From:** Carlberg, Russell (USACAE)
**To:** Carlberg, Russell (USACAE) ; Jay Greiner
**Cc:** Tice-Raskin, Robert (USACAE) ; Hemesath, Paul (USACAE)
**Sent:** Wednesday, December 21, 2011 3:03 PM
**Subject:** RE: Warren Plea Agreement