PHILLIP A. TALBERT
United States Attorney
PAUL HEMESATH
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                         Plaintiff,<br><br>            v.<br><br>CHRISTOPHER JARED WARREN,<br><br>                         Defendant. | CASE NO. 2:09-CR-00121 JAM<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE |

## I.      INTRODUCTION

With millions of dollars' worth of assets still outstanding and unaccounted for, the government opposes defendant CHRISTOPHER WARREN's motion to end his term of supervised release early.

Warren's underlying crimes were extremely serious in scope and method. With Lee Loomis, Warren helped to manage one of the District's largest mortgage fraud schemes and then later—with his co-defendant Scott Cavell—he outright stole seven million dollars and then absconded from the United States. Warren converted $6 million of the theft to gold for his and Cavell's journeys abroad and $5.5 million remains unrecovered.

Warren's multiple acts of theft and deception, combined with the still-missing proceeds of his crime, should obviate any notion that he be allowed to escape financial reporting requirements and other restrictions before they expire.

## II. BACKGROUND

In 2007 through 2008, Warren worked at Nationwide Lending Group, which was associated with Loomis Wealth Solutions. PSR ¶ 4. Both companies were implicated in a massive mortgage and investment fraud scheme. PSR ¶ 5. Warren participated in the scheme by directing his employees to falsify documents for loan packages, create false HUD-1 statements, and generally defraud banks making the loans. PSR ¶¶ 8-10.

After participating in what he later described as a $800,000,000 fraud while acting in the Loomis mortgage fraud conspiracy,[1] Warren met with federal agents to begin what seemed like contrite cooperation. PSR ¶ 11. Warren assured agents that he would shut down his mortgage related businesses and not engage in any further fraudulent conduct. PSR ¶ 12. Approximately four months later, agents learned that Warren had posted a seven-page confession on his company's website (reproduced in part at PSR ¶ 12), illegally obtained another person's passport, and chartered a private jet to Lebanon with millions of dollars of converted gold. PSR ¶¶ 12-18. At the same time, co-defendant Scott Cavell fled to Ireland.

Warren and Cavell stole the money by falsely applying to be a "correspondent lender" for a company called Taylor, Bean, and Whitaker Mortgage Corporation. After building bona fides by funding about 10 legitimate loans, Warren and Cavell simply stole money that was supposed to be transferred for mortgage loans. PSR ¶ 17. Through 28 bank wires, Warren and Cavell moved the money to gold bullion dealers and then fled overseas. PSR ¶¶ 17-18. Warren was later arrested attempting to re-enter the United States using a false identity. PSR ¶ 17.

On January 10, 2012, Warren pleaded guilty before this Court to a violation of 18 U.S.C. § 1343 – wire fraud, and 18 U.S.C. § 1028A – aggravated identity theft.

On September 11, 2012, this Court sentenced Warren to 175 months in prison, with a three-year term of supervised release. Dkt. No 80. The PSR recommended a term of 264 months of imprisonment. PSR ¶ 111. He was also subject to a forfeiture judgment in the amount of $19,877,118 including $7,457,118 for restitution to Taylor, Bean, and Whitaker, and $12,420,000 to lenders in the

---

[1] Lee Loomis died shortly after obtaining Compassionate Release in October 2020.

Loomis Wealth Solutions fraud.

Warren was released on July 15, 2020. As of the date of this filing he has served approximately 18 of his 36 months of Supervised Release. There have been no recorded incidents while he has served his TSR.

United States Probation Officers Wendy Reyes and Miriam Olea were contacted, and the government proffers as follows: Both Officers Reyes and Olea indicated that they would not say that they "support" Warren's early termination, but only that they do not oppose it. Def. Br. at 2 (claiming that both officers support Warren's early release). Both Officer Reyes and Olea also denied having the opinion that "the supervisee has derived maximum benefit from supervision and is not in need of continued supervision." Def. Br. at 8 (stating this to be the position of the officers). Rather, they would say that they do not oppose early termination. Officer Olea added that, at this time, there is no programing through probation that Mr. Warren would benefit from.[2] Officer Reyes said that Warren did more than what was expected; Officer Olea said that he did what was required. Def. Br. at 2 (stating that both officers said that Warren did more than was expected).

### III.     LEGAL STANDARD

Under 18 U.S.C. § 3583(e), a district court may "modify, reduce, or enlarge the conditions of supervised release" only under specific conditions. In order to terminate a term of supervised release early, the offender must have been supervised for at least one year of supervised release and the district court must find that "if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1). In making this determination, the district court must consider eight specific sentencing factors selected from 18 U.S.C. § 3553(a).[3] *Id.* The Ninth

---

[2] As is argued below, the government's argument is not for additional programming, but continued obligation to report and answer truthfully about Warren's finances and disposal of assets.

[3] The enumerated 18 U.S.C. § 3553(a) sentencing are:

    (a)(1): the nature and circumstances of the offense and the history and characteristics of the defendant;

    (a)(2)(B): the need to afford adequate deterrence to criminal conduct;

    (a)(2)(C): the need to protect the public from further crimes of the defendant;

    (a)(2)(D): the need to provide the defendant with needed educational or

1  Circuit has observed that the burden rests on the defendant, "as the party receiving the benefit of early
2  termination, to demonstrate that such a course of action is justified." *United States v. Weber*, 451 F.3d
3  552, 559 n.9 (9th Cir. 2006) *citing United States v. Weintraub*, 371 F.Supp.2d 164, 167 (D.Conn. 2005);
4  *United States v. McKay*, 352 F.Supp.2d 359, 361 (E.D.N.Y. 2005).

   Warren incorrectly claims that, after 18 months of supervision, there is a "presumption in favor of recommending early termination for…supervised releasees." Def. Br. at 2. This is both unfounded and incorrectly applied. It is unfounded because the document cited—"Guide to Judiciary Policy, Vol. 8E, Ch. 3, Page 29"—does not exist on the United States Courts website[4], Westlaw, or any official site findable by the government. This document was only retrievable was on sites denominated as: *madisonattorney.com*, *pcr-consultants.com*, and *prisonlogyx.com*. It is unknown who wrote the cited document, on what authority the document is predicated, or whether the document is in effect. The government asks the Court to ignore the Warren's citation to this unfindable document in favor of the contrary Ninth Circuit law, cited above.

   Furthermore, Warren asks the Court to apply the "presumption" (purported in Volume 8E) in favor of his release as if it has legal force on this Court and in this proceeding. Def. Br. at 2 and 6.[5] Even if the Court takes this unfounded document at face value, the document does not instruct the Court that there is a legal presumption in support of early release—at most it appears to be general advice to probation officers. There is simply no legal presumption in favor of Warren's early release. As the

---

vocational training, medical care, or other correctional treatment in the most effective manner;

(a)(4): the kinds of sentences available;

(a)(5): any pertinent policy statement;

(a)(6): the need to avoid unwarranted sentence disparities; and

(a)(7): the need to provide restitution to any victims of the offense.

[4] United States Courts website: *https://www.uscourts.gov/rules-policies/judiciary-policies*. If Warren provided a source for this document, the government would consider its effect as, at least, a credible document. The government would still object, however, in terms of its non-binding effect on any court.

[5] At page 2: "Since MR. WARREN has been 'under supervision for at least 18 months… there is a presumption in favor of recommending early termination for…supervised releasees'." At page 6: "…he respectfully requests that the Court follow the "presumption in favor of recommending early termination'…."

OPPOSITION                                4

Ninth Circuit observed, the burden should rest on the moving party. *See Weber*, 451 F.3d at 559 n.9.

Early termination of supervised release is a rare occurrence, usually preceded by "new or unforeseen circumstances" that render the original term "'either too harsh or inappropriately tailored to serve the general punishment goals of section 3553(a).'" *See United States v. Miller*, 205 F.3d 1098, 1101 (9th Cir. 2000) (quoting *United States v. Lussier*, 104 F.3d 32, 36 (2d Cir. 1997)); Fed. R. Crim. P. 32.1(b), Advisory Committee Note ("Probation conditions should be subject to modification, for the sentencing court must be able to respond to changes in the probationer's circumstances as well as new ideas and methods of rehabilitation."). The court may consider, among other factors, the absence of an undue burden on the defendant in finding that early termination is not in "the interest of justice." *United States v. Emmett*, 749 F.3d 817, 820 (9th Cir. 2014). Whatever decision is made on defendant's request, the Ninth Circuit has held that a district court has a "duty to explain" its decision on requests for early termination of supervised release. *United States v. Emmett*, 749 F.3d 817, 820 (9th Cir. 2014).[6]

## IV.    ANALYSIS

### A.    Warren cites to no credible reason for terminating early.

Warren contends that his compliance with the terms of his supervised release and other efforts to "fully reintergrat[e] into society warrants early termination. Def. Br. at 9. In particular, he claims to be gainfully employed, a good father and husband, and that he donates his time to good causes. While these developments are commendable, they are not a legal basis to find the defendant has carried his burden to show it is in the "interests of justice" to terminate early by demonstrating, for example, "new or unforeseen circumstance," *Weber*, 451 F.3d at 559 n.9, or that his three-year term of supervised release was "either too harsh or inappropriately tailored to serve the general punishment goals of section 3553(a)." *Miller*, 205 F.3d at 1101. Indeed, compliance is to be expected while on supervised release and does not, alone, warrant early termination. *See United States v. Flint*, No. 2:08-CR-00288-GEB, 2014 WL 3966299, at *2 (E.D. Cal. Aug. 13, 2014) ("Although Defendant argues his good behavior warrants early termination of supervised release, 'compliance with release conditions, resumption of

---

[6] Extensive detail is not required in explaining the denial of an early-termination request. In *Emmett*, for example, the Ninth Circuit remanded with the instruction that "the district court need not give an elaborate explanation of its reasons for accepting or rejecting Emmett's arguments." *Emmett*, 749 F.3d at 821-22.

employment and engagement of family life-are expected milestones rather than a change of circumstances rendering continued supervision no longer appropriate.'") (internal citations omitted); *United States v. Sine*, No. CR-S-02-079 KJM, 2012 WL 1901298, at *2 (E.D. Cal. May 24, 2012) ("'[F]ull compliance with the terms of supervised release is what is expected of [defendant] and all others serving terms of supervised release and does not warrant early termination.'") (internal citations omitted). Indeed, "if compliance with the terms of probation necessarily awarded termination to a petitioner, the term itself would be pointless." *United States v. Leone*, 2013 WL 867527, at *2 n.5 (E.D.N.Y. Mar. 4, 2013) ("If bad behavior warrants a revocation of probation (in favor of imprisonment) and good behavior warrants an early termination of probation, then nary a defendant would serve the actual term of probation. The exception would indeed swallow the rule.").

Warren himself identifies a single reason for his request for early termination—the ability to work with inmates and students and the need to travel as a result. Def. Br. Exh. 1 at 2. The government would not object to a modification of the Terms of Supervised Release to allow him to perform work with and travel to these individuals. The government does object, however, to the elimination of conditions that require him to answer truthfully to questions from his probation officer, to notify probation of changes in employment, to not associate with persons engaged in criminal activity, to submit to authorized search, to not dispose of assets without approval, and to provide requested financial information, among others—in other words Special Conditions 1-11.[7] Dkt. No. 67. The reasons for preserving these Special Conditions as originally ordered by the Court are set forth below.

### B. The nature and circumstances of Warren's offense show that continuing his three-year Term of Supervised Release are both logical and justified.

Warren should serve the remaining term of his supervised release because the nature and circumstances of his crimes were continuous, deceptive, and repeated even after assuring law enforcement that he would not commit more crimes. PSR ¶ 12. His subsequent theft and absconding from the United States demonstrate that he was uniquely premeditative and deceiving in his efforts to steal millions of dollars and escape justice.

---

[7] Warren would not be subject to these conditions by the Financial Litigation Unit (FLU) of the U.S. Attorney's Office, as he seems to imply. Def. Br. at 4.

OPPOSITION                                6

C. **Warren's sentencing proceedings contemplated a Term of Supervised Release in the context of the stolen assets that were never returned.**

Sentencing pleadings specifically considered Warren's term of supervised release as a means to mitigate and possibly recover Warren's still-missing $5.5 million worth of stolen gold (PSR at ¶ 18—now worth $11.6 million if still existing as gold[8]).  In the government, in its sentencing memorandum, observed that, "[e]ven though probation is concerned that the defendant has potentially concealed assets, the fact is he will be on supervised release following his imprisonment."  Dkt. 65 at 4.  The government cited this fact as a reason to recommend a 175-month sentence, down from the 264-month sentence recommended by U.S. Probation.  Indeed, Warren and the government had agreed to request a Term of Supervised Release of <u>six-years</u> in the plea agreement (Dkt. No. 51 at 3), but U.S. Probation observed that TSR terms may not be served consecutively by count.  PSR at ¶ 95.

If there are particular conditions of supervision that are causing Warren undue hardship, he should identify those conditions for consideration of their modification.  But so long as the $5.5 million in assets remains unaccounted for, Warren should not be absolved of his obligations to report assets and answer financial questions from U.S. Probation.

V. **CONCLUSION**

Unlike most cases in which imposition of a Term of Supervised Release is a pro forma exercise in sentencing proceedings, there were ample and logical justifications for the Court to order Christopher Warren to serve a three-year term of supervised release.  As long as millions of dollars of stolen assets are not accounted for, he should not be allowed to escape his responsibility for their disappearance.  Serving another 18 months of the lawfully imposed Term of Supervised Release is not an undue hardship on him, and he had not met his burden to show why the Court should undo a sensible term imposed for uniquely justifiable reasons.

---

[8] $5.5 million in gold at January 2009 prices ($860 per ounce) factoring the current price of gold ($1818) equals approximately $11.6 million.

OPPOSITION   7

1  Dated: January 18, 2022

PHILLIP A. TALBERT
United States Attorney

By: /s/ PAUL HEMESATH
PAUL HEMESATH
Assistant United States Attorney